State, Gregory, Taylor, et al., pros., v. Jersey City.

THE STATE, GREGORY, TAYLOR, AND OTHERS, PROSECU-
TORS, v. MAYOR AND ALDERMEN OF JERSEY CITY.

1. The power of the board of aldermen of Jersey City to acquire lands
whereon to build wharves, which shall be the property of the city, is
that granted by the twelfth sub-division of the fifty-fifth section of the
charter of 1870, and (except in that part of the city south of Grand
street) is restricted to lands lying at the termination of streets. The
powers contained in the eleventh sub-division of the same section are
simply such as enable the board of aldermen to prescribe rules and
regulations for the construction and use of wharves which are built
by private owners on their own lands.

2. The expenses of opening and grading streets are required by the char-
ter to be assessed upon lands benefited by such improvements, and the
board of aldermen cannot make a contract to purchase lands for a
certain sum, part of the consideration of which is the grading by the
vendor of streets lying adjacent to such lands, and thus cast the bur-
then of such improvement upon the city treasury.

3. The fifty-third section of the city charter provides " that no alderman
or other officer of the city, whether elected or appointed, shall be
directly or indirectly interested in any contract, work, or business, or
sale or purchase of any article, the expense, price, or consideration of
which is paid from the city treasury, or by any assessment levied by
any act or ordinance of said aldermen." *Held*—

*First.* That the prohibition of this section is not confined to contracts for
supplies furnished to the city in its several departments, or for the
execution of work for the city. It extends to all contracts of sale to
the city, the price or consideration of which is paid from the city trea-
sury, without regard to the subject matter of the contract.

*Second.* That an agreement in contravention of the prohibition of this
section is illegal; and an ordinance or resolution of the board of alder-
men, by which it is attempted to bind the city by a contract within
the prohibition, is equally invalid with the contract it purports to
make.

4. The jurisdiction of this court to review the proceedings of municipal
corporations, in matters affecting the rights and property of individ-
uals, which are judicial or *quasi* judicial, even where their acts are
such as pertain to the corporation in its legislative capacity, is un-
doubted; and a relaxation of the rule of the common law, that for the
usurpation of authority by public bodies there is no redress at the
instance of an individual until his person or property is directly
affected by the enforcement of the illegal proceeding, has been sanc-
tioned by a long course of practice in the administration by this court

State, Gregory, Taylor, et al., pros., v. Jersey City.

of its superintending power over corporations and tribunals exercising special statutory powers.

5. A tax-payer—the owner of property, real and personal, within a city —may prosecute a *certiorari* to remove an ordinance or resolution of the board of aldermen which is in excess of authority, and in violation of restraints in the charter upon their official action, for the protection of tax-payers, without waiting until an assessment is made against him of taxes which are the fruits of an illegal exercise of power by the city government.

6. A resolution of the board of aldermen of Jersey City, directing the committee on ferries, wharves, and piers to purchase, for the purpose of a wharf, a lot of land, not authorized by the city charter, the title to which was in a third person, in trust for two of the members of the board of aldermen, and part of the consideration of the purchase was the graduation by the vendor of streets leading to such projected wharf, set aside on *certiorari* prosecuted by tax-payers before the purchase was completed by delivery and acceptance of a deed.

On *certiorari*.

Argued at November Term, 1870, before WOODHULL, DEPUE, and VAN SYCKEL, Justices, by

*J. Dixon, Jr.*, for plaintiffs in *certiorari*.

*S. B. Ransom*, for defendants.

The opinion of the court was delivered by

DEPUE, J.  The writ of *certiorari* in this case brings up for review the resolutions and proceedings of the board of aldermen of Jersey City, in relation to the purchase of certain lands whereon to build a dock, on the Hackensack river.

The resolutions were originally passed in the board on the 26th of July, 1870, and authorized the committee on ferries, wharves, and piers "to purchase from Stephen Morgan a piece of property on the Hackensack river, adjacent to West St. Paul's avenue, and west of Ninth street, containing about forty-two city lots, for dock purposes, and described in proposition and map presented July 17th, 1870, for the sum of $42,000, on condition that said Stephen Morgan shall

grade the street leading to it, from Ninth street to the Erie Railroad, and make an outlet to West St. Paul's avenue, and grade Ninth street across the rear of the property." The resolutions provided for the payment of the sum named by the issue of coupon bonds of the city, payable in thirty years, with interest at the rate of seven per cent., $30,000 of which were to be delivered on the delivery of the deed, and the balance on the completion and acceptance by the board of the grading of the streets named.

The resolutions being sent to the mayor for his approval, were returned by him to the board of aldermen, with his objections, and were afterwards passed by the number of votes necessary to pass an ordinance or resolution which has been vetoed by the mayor.

A number of reasons were assigned for annulling these proceedings. It will only be necessary to consider such of them as relate to the power of the board of aldermen to purchase the lands and make the contract in question.

The power of the city to acquire land and establish wharves, which shall be the property of the city, is that contained in the twelfth sub-division of the fifty-fifth section of the city charter. *Acts of* 1870, *p.* 1170. It was argued by the counsel of the defendants that the twelfth sub-division of that section only applied to wharves in the specified localities, or such as adjoined the termination of present or future streets of the city, and that more enlarged powers—in fact, unrestricted and unlimited—were granted by the eleventh sub division of the same section of the charter. His argument was based exclusively upon the words in that section which gave the board of aldermen power " to order and regulate the building of all docks, piers and wharves in and about said city, and to regulate said docks, wharves, and piers, and the use thereof when built, and the rates of wharfage."

Under a power to establish and regulate markets, it has been held that a municipal corporation has the power to purchase and hold lands on which to erect market buildings.

*Ketchum* v. *City of Buffalo*, 14 *N. Y.* 356; *S. C.*, 21 *Barb.* 294; *The People* v. *Lowber*, 28 *Barb.* 65. In the case first cited it was said by Justice Selden: "Were the words 'to regulate' the only words used, it is clear that the authority to purchase the ground could not be deduced from them; those words naturally, if not necessarily, pre-suppose the existence of the thing to be regulated. Not so, however, with the words 'to establish;' although these words may mean simply to confirm, yet their more common import is permanently to create or found." The words used in the eleventh sub-division of this section of the defendants' charter are "to order and regulate the building, &c., of all docks, piers, and wharves." These words are adapted simply to authorize the board of aldermen to prescribe rules and regulations for the mode of constructing wharves by the owners of the lands on which they are built. The structure and language of this sub-division throughout show that this was the obvious intent of this part of the city charter. If this construction was left in any doubt by the words used, the fact that special provision is made in the succeeding sub-division, and that powers are there granted specifically over the subject matter, under qualifications and restrictions, demonstrates that it was not intended by the legislature that the jurisdiction of the aldermen was to emanate from any implication arising from general language used in other parts of the charter.

The twelfth sub-division of the fifty-fifth section is in the words following: "To build and construct wharves, docks, and piers, which may adjoin the present or future termination of any of the streets within the limits of said city, and which may be flowed with tide water; provided, however, that the said city may lawfully acquire the title to the land at such terminations of any of the said streets not now owned or subject to the control of said city by purchase of the owner or owners thereof, or by condemnation; and to control and to have the proceeds therefrom deposited in the city treasury, for the benefit of the city; and to purchase or

State, Gregory, Taylor, et al., pros., v. Jersey City.

hold such land and any other land south of Grand street, in Jersey City, whether covered by tide water or otherwise, or the rights of the owners of the shore therein, as they may deem for the interest of the city, in order to have constructed and built, in any part of Jersey City south of Grand street, when, in their judgment, the public necessities require the same, wharves, docks, and piers, and to control, regulate, and govern the same in the manner hereinbefore mentioned."

Any uncertainty in the description of the lands which the corporation may acquire, arising from the use of the words "which may adjoin the present or future termination of any of the streets," in the introductory paragraph of this extract from the charter, is removed by the use of the words "at such termination of any of the said streets," in the proviso immediately annexed thereto. That proviso relates to the acquisition of lands for the designated purpose, where the same were not, at the passage of the charter, owned by or subject to the control of the city. The words in that proviso descriptive of the lands which may be acquired for that purpose, give certainty to such description. They must be such lands as are *at the termination* of a street. South of Grand street the authority is not limited to lands situate at the termination of streets. Within those limits the board of aldermen may acquire, by purchase, any lands whereon to build wharves, docks, and piers, the acquisition of which for that purpose they deem for the interest of the city. Elsewhere within the city limits the power to acquire lands for that purpose is restricted to such lands as lie *at* the termination of a street.

The lot of land, the purchase of which is directed by the resolution now under review, lies north of Grand street. It comprises forty-two city lots, lying between Ninth street and the river, and extends upwards of six hundred feet along the river, with an average depth from the river of about two hundred feet. At the one end, a street extends from Ninth street eastwardly, which is not graded or improved. No other part of the tract is at the termination of any street

actually opened or projected under public authority. Without attempting to define what the limits of the lot shall be, to fall within the designation of "the land at the termination of any of the streets," it is manifest that it was never contemplated by the legislature to permit the acquisition by the city of a lot of the dimensions of the one in question, as the land at the termination of a street. Furthermore, as part of the consideration of the purchase money of $42,000, the owner, by the resolution, was required "to grade the street leading to the premises from Ninth street to the Erie Railroad, and make an outlet to West St. Paul's avenue, and grade Ninth street across the rear of the property." By the provisions of the city charter the expenses of opening new streets, and of grading the streets, are to be assessed upon the lands benefited by such improvement. The provisions of the charter which regulate the mode in which such improvements shall be made, and declare how the expenses thereof shall be defrayed, are obligatory upon the board of aldermen. They have no power to contract for the execution of that work so as to cast the burthen upon the city treasury.

The next reason relied on for avoiding these proceedings is, that two of the members of the board of aldermen were interested in the lands which were purchased.

The title to the lands was formerly in Van Keuren & Batty, who, in the early part of the summer of 1870, conveyed it to Morgan, in trust, to secure three persons, of whom Burnsted was one, for endorsements made by them for the firm of Van Keuren & Batty. The property was conveyed to Morgan at the request of these endorsers, and after their endorsements were paid out of the proceeds of sales made of the property, the residue was to revert to Van Keuren & Batty. Burnsted and Van Keuren were members of the board of aldermen when the contract of purchase was commenced and concluded. Burnsted was also a member of the committee on wharves and piers, to which was referred the several propositions which were made to

the board for the sale to them of lands for a wharf on the Hackensack, and joined in the recommendation that the proposition of Morgan should be accepted. Burnsted and Van Keuren both voted for the resolution on its passage, and also on its reconsideration after the veto by the mayor. Their votes were necessary to obtain the requisite number of votes to pass the resolution over the mayor's veto.

By the fifty-third section of the city charter it is enacted "That no alderman or other officer of the city, whether elected or appointed, shall be directly or indirectly interested in any contract, work, or business or sale or purchase of any article, the expense, price, or consideration of which is paid from the city treasury, or by any assessment levied by any act or ordinance of said aldermen; nor shall any alderman be directly or indirectly interested in the purchase of any real estate or other property belonging to the corporation, or which shall be sold for taxes or assessments, or become security for any officer appointed by said aldermen, or for any contractor under the city government."

The defendants' counsel endeavored to construe this section so as to limit its prohibition to interest in contracts for supplies furnished to the city in its several departments, and for the execution of work for the city. That the section applies to such transactions cannot be doubted, but I am unwilling to restrain its operation within those limits. The section is highly remedial, and should be liberally construed. The words "contract" and "sale" which are used, may, without violating any rules of interpretation, be construed to embrace every contract with or sale to the city. The only expressions that qualify the generality of the signification of these terms are the succeeding words, "the expense, price, or consideration of which is paid from the city treasury." These words exclude from the operation of this part of the section, sales of public property by the city, which come within the next paragraph of the section; but with respect to sales or contracts to sell to the city, they give to the pre-

ceding words an application co-extensive with the means which will be required to discharge the obligation. If the price or consideration comes from the city treasury, the contract with or sale to the city is prohibited by the section, where any alderman or other officer of the city is directly or indirectly interested in such contract or sale, without regard to its subject matter. This construction will effectuate the intention of the legislature in embodying this section in the city charter. The design was to guard against the danger of abuses in a municipal government, which embraces a territory of large extent, and whose transactions in the management of the affairs of the city, and in making needful public improvements, must necessarily be of considerable magnitude.

The result of this section is the prohibition of any contract of sale to the city in which any of its officers are interested, and every agreement of that charter is utterly void. A contract is illegal if it be opposed to the general policy and intent of a statute. *Staines* v. *Wainwright*, 6 *Bing.* (*N. S.*) 174; *Sharp* v. *Tees*, 4 *Halst.* 352; *Elliott* v. *Richardson*, *Law Rep.*, 5 *C. P.* 744; *Bell* v. *Quin*, 2 *Sandf.* 146; *Sedgwick on Statutory Construction* 85. A contract entered into with a municipal corporation, in violation of the provisions of its charter as to the mode of entering upon the contract, is void, although it relates to a subject matter with respect to which the corporate authorities have capacity to contract. *Brady* v. *City of New York*, 20 *N. Y.* 312; *Christopher* v. *The Same*, 13 *Barb.* 557; *Cowan* v. *Village of West Troy*, 43 *Barb.* 48. It would seem to be a self-evident proposition that the board of aldermen has not the power or jurisdiction to pass any ordinance or resolution which shall bind the city to a contract prohibited by the charter, and that the ordinance or resolution must be equally invalid with the contract it purports to make.

On either of the three grounds considered we have no hesitation in declaring that the resolution and proceedings of the board of aldermen are unlawful.

It is insisted on the part of the defendants, that the prosecutors are not entitled to prosecute a *certiorari* to avoid these proceedings. The position taken is, that a tax-payer cannot litigate the acts of the administrative board of a municipal corporation, even on jurisdictional grounds, until his individual rights are actually invaded by an assessment upon his property to meet the expenditures made in executing such illegal acts.

The prosecutors are residents of, and the owners of property, real and personal, within the city, liable to taxation.

It is conceded that there is no relief in any court from the legislative acts of a municipal corporation, however unwise, impolitic, or injurious to the interests of tax-payers, which are within the limits of the authority of its charter, and have been passed in compliance with the requirements thereof. *Bond* v. *Mayor, &c., of Newark*, 4 *C. E. Green* 376. But where the proposed legislation is in excess of authority, and is in violation of the restraints which, in the charter, have been put upon its official action for the protection of its citizens in the matter of taxation, may not tax-payers litigate such illegal act, without waiting for the tardy and unsatisfactory remedy by each individual tax-payer, to avoid the assessment against him of taxes which are the fruits of an illegal exercise of power by the city government?

The jurisdiction of this court to review the proceedings of municipal corporations in matters affecting the rights and property of individuals, which are judicial or *quasi* judicial in their nature, even where their acts are such as pertain to the corporation in its legislative capacity, is undoubted. *City of Camden* v. *Mulford*, 2 *Dutcher* 49; *Carron* v. *Martin*, *Ib.* 594; *State* v. *Newark*, 1 *Dutcher* 400; *State* v. *City of Perth Amboy*, 5 *Dutcher* 259. The inquiry, therefore, is not what the powers of this court are, but what its established practice is, in the administration of those powers.

Until the passage of the municipal corporation acts (5 *and* 6 *Will. IV.*, ch. 76,) and the supplementary acts of, 7 *Will.*

*IV.*, and 1 *Vic.*, ch. 78, § 44, the rule of the English courts was, that the individual rights of the citizen must be directly invaded by the assessment of a tax before he could sue out a writ of *certiorari*. The principle was general that for the usurpation of authority by public bodies, the remedy was exclusively in the name of the attorney-general, acting in behalf of the public, and that no right of individual redress existed, except when the person or property of the individual was directly affected by the enforcement of the illegal proceeding.

A long course of practice in this state has sanctioned a relaxation of the rules of practice of the Court of King's Bench, in the administration by this court of its superintending power over corporations and tribunals exercising special statutory powers. The interest which every citizen has in public highways has been held a sufficient interest to enable him to prosecute a *certiorari* to test the legality of the action of surveyors of the highways in vacating a public road, although he was not the owner of any lands adjoining the highway, or interested in its continuance as such, otherwise than as one of the public. *State* v. *Snedeker*, 1 *Vroom* 80. This decision was approved by Justice Elmer, in *The State, Miller, pros.*, v. *Stout*, 4 *Vroom* 42—a case in which this court vacated the return of surveyors laying out a highway, on a *certiorari* prosecuted by the owner of lands taken, for the reason that they assessed damages to another owner, who was an applicant for the road. In that case the prosecutor was not specially injured by the wrongful assessment to the other owner for his damages, which were required to be paid by the township. So, also, a tax-payer and resident within a municipal corporation has been allowed to apply to the court for a *mandamus* to compel the city council to order an election to fill a vacancy in that body. *The State* v. *Common Council of Rahway*, 4 *Vroom* 110. And to become a relator in proceedings by writ of *quo warranto*, to test the legality of the election of its members. *State* v. *Tolan*, 4 *Vroom* 195. In *The State* v. *Albright, Spencer*

644, the *certiorari* was issued to review a resolution of a town meeting, directing certain moneys to be appropriated to school purposes, and was directed to the moderator and clerk of the township. The writ was allowed in open court, and four individuals were admitted as prosecutors, without its being mentioned what their interests were, and, as appears by the rule, the writ was issued to remove the resolution of the town meeting, in order that this court might determine and settle whether or not the said tax or appropriation exceeded the sum authorized by law, and if so, to reverse so much thereof as was excessive and illegal. In *The State, Van Vorst, pros., v. Kingsland, 3 Zab.* 85, the writ was directed to the clerk of the township, and was issued to bring up the proceedings of an annual town meeting, touching the raising and appropriation of certain taxes for the support of schools. Although the writ was dismissed on the argument, for the reason that the money had been collected and disbursed under the vote of the inhabitants, without objection, except by the prosecutor, the power of the court to restrain such proceeding was declared by Justice Carpenter to be indisputable.

Writs of *certiorari*, to review the proceedings of municipal corporations, have been sued out by prosecutors whose rights have not been directly affected, and the court has set aside municipal ordinances before any proceedings have been taken to put them in force. *State v. Justices of Middlesex, Coxe* 244 ; *State v. New Brunswick, Coxe* 393 ; *State, N. J. R. R. & Tr. Co., pros., v. Jersey City,* 5 *Dutcher* 170 ; *The State, New Jersey Associates, pros., v. Jersey City,* 5 *Vroom* 31 ; *The State, Danforth, pros., v. City of Paterson,* 5 *Vroom* 163.

In *State v. Justices of Middlesex,* the writ was issued " on the application and complaint of some of the inhabitants." In *State v. New Brunswick,* a writ was allowed, to test the validity of an ordinance, on the application of the prosecutor, who is described as " one of the citizens of New Brunswick." In *The State, The N. J. R. R. & Tr. Co., pros., v. Jersey City,* an ordinance of the city was declared null and void, on

*certiorari*, although the obnoxious ordinance had not been enforced against the prosecutors, nor had any steps been taken towards its enforcement. In *The State, The Jersey Associates, pros.,* v. *Jersey City,* a resolution of the common council, directing the street commissioner to remove all obstructions in the way of free access to the wharves at the ends of the streets of the city, was decided to be a resolution which the common council had no power to execute. In this last case, too, nothing had been done by way of executing the order when proceedings were arrested by the writ of *certiorari.* In both these cases, the interests of the prosecutors arose from the circumstances that they were the owners of property and franchises, which would be interfered with and injured if the ordinance and resolution were carried into effect.

The cases cited are unquestionably departures from the rules of the common law; but, nevertheless, they settle the practice of this court.

*The State, Danforth, pros.,* v. *City of Paterson,* is an authority directly on this point. This court, in that case, expressly held that a tax-payer might sue out a writ of *certiorari,* to remove an ordinance of the city for building a market, before anything had been done under the ordinance, and the ordinance was set aside for non-compliance with the provisions of the charter on that subject.

The practice of the Court of King's Bench to deny relief at the instance of an individual, until an assessment is made upon his property, and to reverse the assessment, if erroneous, only as it affects the prosecutors of the writ, has been adopted as the general rule of this court, with respect to taxation for ordinary public purposes, because of the necessity of the revenue derived from such sources in transacting the affairs of the government, state and local, and the public inconvenience that would result from vacating the entire assessment. It was upon these grounds that the writ was refused in *The State* v. *The Clerk of Middletown,* 4 *Zab.* 124. No such considerations of public policy arise in cases of the character of that now before the court. The interests of the corporation, equally with those of the tax-payer, will

be promoted by applying the remedy *in limine*.   If the pro-
ceedings are illegal, and the assessments of taxes, when made,
would be illegal, and (to adopt the language of Chief Justice
Kinsey, in *State* v. *Middlesex*,) " If this court, on *certiorari*,
in each case, would be compelled to say so, it is far better
that the proceedings should be vacated *in toto* at once, to·
prevent much unnecessary expense and trouble."

Proceedings set aside.

CITED *in State, Kean, pros.,* v. *Bronson,* 6 *Vr.* 472; *State, Montgomery,.
pros.,* v. *Trenton,* 7 *Vr.* 85; *State, Hoxsey, pros.,* v. *Woodruff,* 10 *Vr.* 75;.
*Siedler* v. *Chosen Freeholders,* 10 *Vr.* 637.