Bertram Harnett, J.
Surrounded by walls of precedent, and moated-by centuries of channelized thinking, the law can easily suppress newness and find itself critically apart from the social amalgam which is its very reason for existence. And, the risk of analyzing fine points in isolation is the loss of total fairness and justice in the sense it is understood by the society to be served. Such are the dangers in the ease at hand.
The dispute here arises as a result of work stoppages affecting sewage treatment and garbage disposal in New York City instigated during June, 1971. Nassau County, as well as the County Executive of Nassau County, and the Supervisors of the Towns of North Hempstead and Oyster Bay, in their individual and official capacities, sued the Executive Director of District Council 37, American Federation of State, County and Municipal Employees and the President of Local 237, International Brotherhood of Teamsters in their individual and representative capacities. The public officials (including Nassau County) charged the union leaders with conspiring and causing unlawful acts of work stoppage and coercion at city pollution control plants, pumping stations and yards, which resulted in contaminating the waters of Long Island Sound off the north shore of the two involved towns. In their main complaint, the public officials ask for a permanent injunction against the union officials repeating their conduct, compensatory damages of $1,000,000 and punitive damages of $5,000,000. While this main action is pending, the public officials, by motion, have asked this court for a *207 preliminary injunction against the union officials, and also permitted to examine these officials right away in preparation for an injunction hearing.
The union leaders have so far responded by moving to dismiss the complaint, essentially on the grounds that the complained of conduct is over, that the public officials have no right to be suing them, and that no damage has been demonstrated.
In sum, the main action for permanent injunction and damages is not yet ready for trial and its trial is not before this court. All that is before this court at this time are these four motions:
(a) The public officials’ motion for a preliminary injunction;
(b) The public officials’ motion to examine the union leaders now;
(c) The District Council 37 leader’s motion to dismiss the public officials’ complaint; and
(d) The teamster leader’s motion to dismiss the public officials ’ complaint.
For purposes of clarity, these problems will be treated in topical sequence.
I. Denial of Public Officials’ Motion for Preliminary Injunction.
Even if the public officials’ complaint states a good cause of action for permanent injunctive relief, it does not necessarily entitle them to a preliminary injunction.
A preliminary injunction is a serious thing to ask, particularly here, where it asks substantially the grant of the relief sought before the trial on the merits. Accordingly, such injunctions are granted sparingly.
The primary purpose of preliminary injunctive relief is to retain the status quo until the merits of the action may be decided. (Walker Mem. Baptist Church v. Saunders, 285 N. Y. 462, 474.) There is presently in effect a preliminary injunction, similar in effect to the one requested here, issued by the Supreme Court in New York County at the instance of the City of New York in a separate proceeding. Until there is some tangible indication that this injunction is not sufficiently protective, the public officials’ request here is redundant and moot. Moreover, no adequate showing has been made that the acts which the public officials complain about are likely to occur before the trial. (See CPLB 6301.)
With prompt prosecution the trial of the main action should be shortly reached.
*208 II. Motion for Examination Before Trial.
The court will also deny the county’s motion to conduct an early examination before trial.
The public officials attempt to advance their normal opportunity to examine by arguing for special need to prepare for a preliminary injunction hearing. However, since the preliminary injunction is denied, there remains no showing of any reason why the examination is necessary prior to the usual course of such discovery proceedings.
The interests of the plaintiffs will be fully protected by the examination available to them following service of defendants’ answers to the complaint, which should shortly follow in view of the subsequent text.
III. Denial of the Union Leaders’ Motions to Dismiss the Public Officials’ Complaint.
The essence of the matter is in the motions to dismiss the complaint. They test, point by point, the legal basis for the public officials ’ action. It is here that the legal parts may be less than the social whole.
A. Conceding Facts Through Moving to Dismiss.
When a party moves to dismiss a complaint, he concedes (for purposes of his motion) every fact pleaded in that complaint and every inference of fact which may be drawn from it. He seeks to win on the inevitable legal result of those facts most favorable to his opponent. (Cohn v. Lionel Corp., 21 N Y 2d 559, 562; Kober v. Kober, 16 N Y 2d 191, 193.) In short, he says “ Assuming what you say is true, what of it? ”
This is important to recognize, since a party can lose a motion to dismiss a complaint, but win handily upon actual trial of the matters raised in that complaint. It all depends on the proof and the facts actually established at trial.
For purposes of those motions then, the union leaders seek to win on the following necessary assumptions:
1. They conspired with others, used intimidation, and with malice, caused raw sewage to be poured into tidal waters;
2. They did this to pressure the New York State Legislature, and to injure those using the waters or living in proximity to them;
3. The waters were polluted and the ecological balances harmed as a result of their deliberate acts;
*209 4. At least the expense of testing and patrolling the waters was occasioned to the county and towns.
While these may not be the ultimate facts proven at the trial, the union officials claim on their motions to dismiss that they should win as a matter of law even if those are the facts. The court disagrees.
B. The Legal Maze.
The union leaders, in a well-reasoned attack, would pick their way through to success on a series of ripostes to arguments thrust forth by the public officials. They essentially argue four legal grounds:
1. The Taylor Law, dealing, with strikes by municipal employees;
2. Public Health Law, § 1150;
3. Navigation Law, § 33; and
4. The common law.
Each of these will be dealt with separately.
1. Taylor Law.
The complaint alleges that the public officials have instituted this action ‘ ‘ as taxpayers pursuant to Civil Service Law, § 210, subd. 4 and pursuant to the other applicable statutes pertaining hereto ”. Despite the claim of legal grounds under the Taylor Law (Civil Service Law, § 200 et seg.), which is reiterated by the public officials in an affidavit submitted in support of this motion, the public officials concede, at page 17 of their reply memorandum, that: ‘ ‘ they have no standing to sue under the Taylor Act for the simple reason that Nassau County, not being the employer of the striking unions’ New York City employees, is not a proper party ’ ’. This admission is in accord with the provisions of the Taylor Law which provide a remedy against unlawful strikes of public employees only to the “government involved”. (Civil Service Law, § 211.) Moreover, New York City, the involved employer, did sue.
2. Public Health Law, § 1150.
Subdivision 1 of section 1150 says: “ No person, corporation or municipality, shall place or cause to be placed or discharged or cause to be discharged into any of the waters of this state, in quantities injurious to the public health, any sewage, garbage, offal, or any decomposable or putrescible matter of any kind or the effluent from any sewage disposal plant * # * or any *210 refuse or waste matter * * * from any sewer or drainage system ’
The statute is enforceable by the Board of Health and the State Commissioner of Health. The public officials assert that those bodies are not intended to be the sole enforcers, but even that argument must fail, for the right to maintain civil actions for violations is expressly limited to cities and villages. (Public Health Law, § 1157.)
3. Navigation Law, § 33.
In section 33 of the Navigation Law the State had decreed that: “no person shall drain, deposit or cast any * * * offal, excrement, garbage or other putrid or offensive matter into the navigable waters of the state, except as the same may be authorized by the state department of health. Every person violating the provisions of this section shall upon conviction by any court of competent jurisdiction be guilty of a misdemeanor ’ ’. The statute vests enforcement rights in the District Attorney of the county where the offense was committed or exists. Clearly, this statute is penal in nature. The public officials argue, however, that it also confers a civil right of action.
The violation of a penal statute may, under certain circumstances, give rise to civil liability. This occurs where the penal statute was enacted for the benefit and protection of a particular class, where the plaintiff in the civil action is a member of the protected class, and where the harm which was done is that which the statute was intended to prevent. (See Brody v. Save Way Northern Blvd., 37 Misc 2d 240, revd. 19 A D 2d 714, revd. 14 N Y 2d 576 ; Munzer v. Blaisdell, 183 Misc. 773, affd. 269 App. Div. 970.)
Hnder the law, the operation of such a rule must be misty. Can one distinguish penal statutes of “ particular benefit ” from those for the benefit of the public at large ? Should such a concept exist? Is the whole approach anything different than seeking to find in the books an existing base for a legal duty, even in a penal statute? If so, is not the true problem of the case the one of duty under the circumstances, and this finally brings us to the crux of the motions to dismiss.
4. The Common Law.
The public officials have argued they have legal rights under the common law, and could win in the main action apart from such statutory specifics as the Labor, Public Health and Naviga *211 tion Laws. The court here agrees with the public officials, although without embracing all their reasoning or articulation.
C. Responsibility for Wilful Wrong to the Environment.
1. A Legal Need.
The law obviously cannot provide a civil remedy for every personal conflict in the world. (Flamm v. Van Nierop, 56 Misc 2d 1059.) However, there are instances where substantial damage can be done to the public interest which do not fall within the usual categories of causes of action, and yet, redress should be provided for such demonstrated wrong. (Battalla v. State of New York, 10 N Y 2d 237; Calloway v. Munzer, 57 Misc 2d 163.) As the Court of Appeals has noted: “ a cause of action arises where that is done which should not be done ”. (Gonzalez v. Industrial Bank [of Cuba], 12 N Y 2d 33, 38.) (See, also, Merchants Mut. Ins. Co. v. Jackson Trucking Co., 21 Misc 2d 1005.)
The courts should not dismiss or reject claims merely because the claim is novel or a similar claim has not previously been asserted. (Bolivar v. Monnat, 232 App. Div. 33.) This rule should be particularly applicable where, as here, a substantial public right is involved.
The communications media daily remind us of the current ecological crisis which threatens the quality of our daily life. Paralleling those problems in importance to the continuation of orderly and healthy society is the need for obedience to lawful mandates. The facts as conceded in this motion present an unusual combination of the two, a blend resulting from the disregard of these union officials for the lawful processes, thereby affecting the health and welfare of people living on or near the water of Long Island Sound, those utilizing those waters for recreation, and marine life. It is an inadequate remedy to enjoin such behavior after it has occurred, for the damage to the environment is then already done. Organizations, whether unions or corporations, public or private, should not be permitted to escape the penalties of the acts which they willfully perform to the detriment of the public or its physical setting.
Plainly, the legitimate interests of millions of people lie behind the institution of this suit by public officials elected by and representing those people. While courts have traditionally been reluctant to permit municipalities to take action on behalf of their residents in the absence of statutory authority, those cases generally deal with private rights. (Marcus v. Village of Mamaroneck, 283 N. Y. 325; Buckley v. Baldwin, 230 App. Div. 245; Wollitzer v. Title Guar. Trust Co., 148 Misc. 529, affd. 241 App. *212 Div. 757.) Here, the public officials are acting in protection of public rights and public health. (See Nassau County Government Law, § 901 [L. 1936, ch. 879, as amd.]; Public Health Law, § 347; People ex rel. Bennett v. Laman, 277 N. Y. 368.)
2. A New Rule of Law.
The court does not rest this decision on any enunciated interpretation of the Public Health Law or the county charter. Nor does the court rest its decision on a policy interpolation from section 33 of the Navigation Law, even though that might be appropriate here. Nor does the court seek to squeeze a prior case or judicial statement into some conformable pattern to lend authority.
Instead, the court will simply state as its basis a new rule that persons maliciously polluting or contaminating the environment may be enjoined by the chief executive officer of a county or town whose residents are adversely affected by the offensive conduct, or by private citizens reasonably affected. Offensive effect may include economic loss, health hazard whether immediate or reasonably threatening, recreational or aesthetic impairment, or destruction of wildlife. In addition to injunctive sanction, an offending polluter can be answerable in such compensatory damage as may be proven by or on behalf of an injured party, and made to pay punitive damages for deliberate or contemptuous disregard of the environmental rights of others.
a. Standing to Sue.
The court cannot be persuaded by the mechanical application of the concept of ‘ ‘ standing to sue ’ ’ to deny the rights of the public officials to bring this action.
Typically, it is stated a party cannot sue unless he is “ aggrieved ” or has an “interest”, usually a financial one. These are historically notions of property law, and have no application to the articulation of public rights. In the growth of consumerism, and emerging public participation in legal processes, the elected executive of a municipality is the major unifying thread of the whole spectrum of his community. Moreover, he controls the extended resources necessary to do legal battle on behalf of the public interest, whether the opposition be giant business, giant labor or giant government. It is necessary that he be able to sue to protect the environment.
b. Wrong and Recompense.
Under the facts conceded for the purposes of this motion, New York City sewage plants discharge over 580,000,000- gallons of *213 sewage each, day into the upper East River. The prevailing tides and mixtures carry the receiving waters to Long Island Sound including the tributary bays along the north shore of Nassau County. The work stoppage here involved resulted in discharge of substantial untreated raw sewage into the river and thence to the Long Island Sound and the north shore bays. The bacteria count tripled, and in some places increased much more. Algae disturbances resulted. The waters themselves developed a brown scum appearance. The fortuity of absence of normal rainfall permitted the Nassau County bay beaches to remain open, although the beaches on Manhasset Bay were placed on an alert.
The entire area is heavily residential with countless numbers of people involved in diverse residential, recreational and commercial respects.
Further, under the assumed facts, the polluting conduct was deliberate and willful, motivated by a desire to pressure the State Legislature. There was no cloak of legality for the offensive conduct.
The preliminary injunction issued by the New York County Supreme Court is not a permanent one. Moreover, the record is replete with socially hostile statements supposedly made by the defendants, and disputes as to their context. It is not clear that the union leaders will, in fact, in 1972 get what they want. Accordingly, it is for the trial court to weigh the facts and reach a decision with respect to future jeopardy and a possible permanent injunction. There are at least damages for testing and patrolling the area of conceivable effect. And, finally, the sanction of punitive damage must overhang those who would for their own ends wound the public interest in its environment.
Under all these assumed circumstances, how could a court in this society conclude legal redress is unavailable ? Could it turn its back on an admitted wrong perpetrated on such a large scale, protested by the very elected representatives the system projects? Should it ?
The conscience of our community is saturated with environmental awareness, and those deliberately contaminating the environment as an illegal tactic are conspicuously wrongdoers. For the law to ignore this would be to forfeit all credibility. Just as new torts have emerged with new technology, new torts must emerge with changing population pressures and acknowledged social responsibilities.
If the rule of this case is not the law, it should be. And if not now, when?
*214 3. Direction to File Answer.
Since the union officials’ motions to dismiss are denied, they will be given 10 days to file their answers to the complaint, and the matter will thereafter proceed according to law. (CPLR 3211, subd. [f].)