81 N.J. Super. 188 (1963)
195 A.2d 215
J. BEIER THEURER; EDWARD J. SPINELLO; HELEN MARSHALL AND GEORGE W. KANE, MEMBERS OF THE HUDSON COUNTY BOARD OF ELECTIONS AND MEMBERS OF THE BOARD OF CANVASSERS; AND WILLIAM McPHAIL, SUPERINTENDENT OF ELECTIONS OF HUDSON COUNTY; AND RALPH DeMARTINO, CITIZEN AND TAXPAYER OF THE CITY OF HOBOKEN, PLAINTIFFS AND WILLIAM L. PHELPS, FLORENCE B. PHELPS, ERICH F. KORMAN AND JUDITH S. KORMAN, INTERVENERS,
v.
EDWARD J. BORRONE, COUNTY CLERK OF HUDSON COUNTY, ARTHUR C. MALONE, CITY CLERK OF THE CITY OF HOBOKEN, JOHN J. GROGAN, MAYOR OF THE CITY OF HOBOKEN AND LOUIS DePASCALE; STEPHEN E. MONGIELLO; EDWARD J. BORRONE; LORETTA HAACK; GEORGE NELSON; FRANK CAPRIO; LOUIS FRANCONE; THOMAS O'REILLY; AND JOSEPH BARTLETTA, COUNCILMEN OF THE CITY OF HOBOKEN AND VIOLET AVENGO; MARGARET FISHER; CAROLYN EEMAN; JOSEPHINE ASTRAUSKAS; WARD 2, DISTRICT 1; CATHERINE HURRELL; JAMES O'BRIEN; HEINZ F. HUBERT; ANNA LENGERT; WARD 2, DISTRICT 6; VICTOR PINTO; CATHERINE MURANDA; MARIE VALENTINO; FRANCES DeSOMMA; WARD 3, DISTRICT 2; DORIS DONNELLY; VICTOR DAURIA; CATHERINE SORBOLA; HAZEL BRIGGS; WARD 5, DISTRICT 1; MILDRED DARGAN; WILLIAM F. KENNEDY; DANIEL REPETTI; EMMA O'CONNOR; WARD 5, DISTRICT 2; MARTIN MULKEEN; ROSE EMMA; MARY ALUOTTO; VERONICA REPETTI; WARD 5, DISTRICT 3; ROBERT HAYES; ELEANOR GOODE; VALERIE VANDENBERG; STEPHEN LEO GRANDE; WARD 5, DISTRICT 4; JAMES CROSSON; KATHRYN LEMP; MATILDA E. PASBACH; RONALD RUBINO; WARD 5, DISTRICT 5; HELEN McKEEVER; JOHN SCHMIDT; ELVIRA DEGRIPPO; WILLIAM LANE; WARD 5, DISTRICT 6; CATHERINE SCHNEIDER; ROSE LAINO; JENNIE VECCHIO; MILDRED LISA; WARD 6, DISTRICT 3; DOMINICK DiCRISCI; HELEN O'DONNELL; DOLORES MARZOCCA; LENA BUCCO; WARD 6, DISTRICT 4; FREDERICK VASSALO; JAMES HALLIHAN; LILLIAN ALESSI; ALFRED THIELE; WARD 6, DISTRICT 5; MARIE SALVETTI; ELAINE MISKULIN; VIOLA PRESTON; DOLORES PIERRO; WARD 6, DISTRICT 6; MEMBERS OF THE RESPECTIVE DISTRICT BOARDS OF THE CITY OF HOBOKEN; AND ANTHONY L. ROMANO, STEPHEN CAPIELLO AND WALTER HAVENS, MEMBERS OF THE POLICE DEPARTMENT OF THE CITY OF HOBOKEN ACTING ON BEHALF OF ALL MEMBERS OF SAID DEPARTMENT, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 23, 1963.
*190 Mr. Samuel Miller argued the cause for plaintiffs (Mr. William F. Kelly, Jr., County Counsel, attorney).
Mr. Nicholas Politan argued the cause for plaintiffs-interveners (Messrs. Checki & Politan, attorneys).
Mr. Thomas P. Calligy argued the cause for the defendants Romano, Capiello and Havens.
ARTASERSE, A.J.S.C.
This proceeding in lieu of prerogative writs was originally brought by the Superintendent of Elections and the County Board of Canvassers of Hudson County and a taxpayer of Hoboken to restrain, among other relief, the City of Hoboken from paying salary increases purportedly authorized by the November 6, 1962 police pay raise referendum in that city.
Defendants are the county clerk, the city clerk, the mayor and council of Hoboken, 52 election district workers in that city, and three Hoboken policemen who represent the policemen as a class.
The county clerk, the city clerk and the mayor and council have answered that they are willing to abide any determination of this court. The election officers and workers have defaulted. *191 Only the policemen defend, and defend in a vigorous opposition to this suit.
Four other taxpayers of Hoboken were allowed to intervene as plaintiffs. The pretrial order narrowed the relief sought to restrain the payment of the increases and abandoned any statutory relief under the election contest statute, N.J.S.A. 19:29-1 et seq.
Before discussing the legal issues involved, a recitation of the facts which the court has found is in order. The certified election results of November 6, 1962 on Public Question No. 2, which was the pay raise referendum, showed that the question was carried by a plurality of 638 votes, that is, 4,963 "yes" votes to 4,325 "no" votes. Shortly after the election there were anonymous complaints of certain irregularities in the election made to the superintendent of elections, the F.B.I. and to the prosecutor's office of Hudson County. No action was taken until January 7, 1963 when, at the direction of the Deputy Attorney General in charge of the Hudson County prosecutor's office, the superintendent of elections, Mr. William MacPhail, and Mr. Thomas J. Herlihy, a detective from the prosecutor's staff, opened and rechecked the sealed election machines.
The court finds that the machines had been locked and sealed at the close of the polling on November 6, 1962, and that they were in that same untouched condition when opened by the superintendent of elections and Mr. Herlihy on January 7, 1963.
The court finds that the machines when rechecked showed that the actual vote on Public Question No. 2 had been 4,066 "yes" votes to 5,054 "no" votes, that is, that the question had in fact been defeated by a plurality of 938 votes. Thirty-three of those votes were absentee ballots. Hence the machines actually showed 4,033 "yes" votes.
The discrepancies in the returns from 13 election districts leads inescapably to the inference of fraud. The court finds that there were fraudulent returns made from these 13 districts. The evidence at the trial conclusively established these *192 facts. Indeed, plaintiffs' factual contentions have not been challenged at all by defendants. Their defense lies in certain legal objections.
I will first dispose of the defendants' academic issue that the board of canvassers and the superintendent of elections are not proper party plaintiffs since the theory of their action can only be sustained on the ground that it is a taxpayer's suit. While agreeing with this contention, I consider the issue moot because of the presence of the taxpayer plaintiffs who have sufficient standing to maintain the suit. Probably the superintendent of elections and the board of canvassers should have been nominal defendants, as was the county clerk.
Defendants presented two major contentions premised on the same basic argument. First, they assert that a taxpayer in these circumstances is limited in his remedy to an election contest under the Revised Statutes, Title 19. Since the time for such a contest has elapsed, they conclude that this court is without jurisdiction to decide this controversy. Secondly, they assert that the facts which plaintiffs used to show the true result of the election, namely, the testimony of Mr. MacPhail and Mr. Herlihy, were not admissible in evidence. Their position is that the only manner allowed to show the returns is those procedures set forth in Title 19.
Both these contentions are premised upon the defendants' belief that Title 19 provides exclusive remedies for taxpayers seeking to prevent the disbursement of public funds authorized by a fraudulent election return.
The defendants cite Lynch v. Acquilone, 32 N.J. Super. 513 (App. Div. 1954), as authority for this proposition. In that case the suit, although labeled a proceeding in lieu of prerogative writs, was to contest an election after the time allowed by N.J.S.A. 19:29-3 on the grounds that the statutory campaign fund limitation had been exceeded by one of the candidates. The court disregarded the label, and construed it as an election contest, and held that it was not timely.
*193 The Lynch case, however, is distinguished from the instant litigation because it sought enforcement of a statutory election requirement which could be instituted only because of N.J.S.A. 19:39-2. The sole question before the court in that case was whether the petition was filed within time. A taxpayer would have no right to enforce such a limitation except as the statute establishing the limitation may have permitted or allowed.
However, a taxpayer does have a right to prevent illegal payment of public funds. The late Chief Justice Vanderbilt eloquently reiterated this long-established and basic right of a taxpayer in the following language from the now classic case of Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433 (1952). This is what he said:
"These obligations are not mere theoretical concepts or idealistic abstractions of no practical force and effect; they are obligations imposed by the common law on public officers and assumed by them as a matter of law upon their entering public office. The enforcement of these obligations is essential to the soundness and efficiency of our government, which exists for the benefit of the people who are its sovereign. Constitution of 1947, art. I, par. 2. The citizen is not at the mercy of his servants holding positions of public trust nor is he helpless to secure relief from their machinations except through the medium of the ballot, the pressure of public opinion or criminal prosecution. He may secure relief in the civil courts either through an action brought in his own name, Tube Reducing Corp. v. Unemployment Compensation Commission, 1 N.J. 177, 181 (1948); Waszen v. City of Atlantic City, 1 N.J. 272, 276 (1949); Haines v. Burlington County Bridge Commission, 1 N.J. Super. 163, 170-173 (App. Div. 1949), or through proceedings instituted on his behalf by the Governor; Constitution of 1947, art. V, Sec. I, par. 11, or by the Attorney-General, Public Service Coordinated Transport v. State, 5 N.J. 196, 207-209 (1950). Under the former practice the great prerogative writs, especially certiorari, were generally available to the aggrieved citizen, but by art. VI, sec. V, par. 4 of the Constitution of 1947 the relief theretofore granted in such matters as a matter of judicial discretion became a matter of right, see Ward v. Keenan, 3 N.J. 298, 303-309 (1949). Nonfeasance, misfeasance, malfeasance and corruption in public office cannot prevail against an aroused citizenry who have it in their power to end the misconception of some public officials that their obligations are fully met so long as they obey the letter of the law and avoid its penal sanctions. That the shortcomings of some public officers may not make them accountable *194 in our criminal courts does not mean that their nefarious acts cannot successfully be attacked through the processes of the civil law." (8 N.J., at p. 476)
A taxpayer would have this right to sue even without statutory authority. It is of common law origin in this State. The historic development of the taxpayer's cause of action is sketched in the early case of Ferry v. Williams, 41 N.J.L. 332 (Sup. Ct. 1879). Even prior to that time there is evidence of our courts' entertaining such an action. See State, Gregory, Taylor, pros. v. Jersey City, 34 N.J.L. 390 (Sup. Ct. 1871). In The State v. Kingsland, 23 N.J.L. 85 (Sup. Ct. 1851), the court allowed a taxpayer to sue, thus impliedly admitting his standing and its jurisdiction, but denied relief in the exercise of its then discretionary power in prerogative writ actions. In that case the township had voted to appropriate an amount of money for school purposes to be raised by taxes. However, the amount exceeded the statutory limitation. The court did not grant the relief sought by certiorari because the money had already been collected and disbursed. It found that it could protect the taxpayer-plaintiff's interest in another way, as shown in State v. Quaife, 23 N.J.L. 89 (Sup. Ct. 1851), where the court set aside so much of the assessment as was for school purposes.
These ancient cases are cited to show that a taxpayer does not need the election contest statute to bring this action. He has the cause of action on which this suit is predicated, outside the election statutes and in addition to those remedies. See also Tube Reducing Corp. v. State, 1 N.J. 177 (1948); Demoura v. Newark, 74 N.J. Super. 49 (App. Div. 1962); Koch v. Borough of Seaside Heights, 40 N.J. Super. 86 (App. Div. 1956), affirmed on opinion below 22 N.J. 218 (1956); Haines v. Burlington County Bridge Commission, 1 N.J. Super. 163 (App. Div. 1949); Aichele v. Borough of Oakley, 1 N.J. Super. 621 (Law Div. 1948); Gimbel v. Peabody, 114 N.J.L. 574 (Sup. Ct. 1935), and 18 McQuillin, Municipal Corporations, Section 52.04, p. 7 (1950).
*195 The election contest procedure does not deprive the taxpayer of this common law right. Thus, in the situation under consideration here, it must be concluded that the election contest remedy is not involved.
A taxpayer's suit is one of our system's strongest deterrents to corruption. It is a powerful check upon complacent or dishonest public officials. It is one efficacious mode by which an alert citizenry is able to maintain that eternal vigilance which still remains the price of freedom. Without the taxpayer's suit our government might well wallow in favoritism and graft since "nothing is more necessary for the triumph of evil than the silence of good men." Such an action then must not be unnecessarily restricted by the court through narrow judicial interpretation.
The taxpayers of Hoboken will be defrauded if this court does not act. N.J.S.A. 40:46-27 requires that if a majority of the voters cast negative ballots on the pay raise referendum, the ordinance will not be passed. The people's express will cannot be defeated by failure of election workers to perform their duties correctly. The law cannot allow legislative status thus contemplated upon the people's vote to be thwarted by the failure of public officials to perform properly a ministerial duty. A very early interpretation that there is an overlapping between the election laws and the court's inherent powers was rendered in the case of Conger v. Convery, 52 N.J.L. 417 (Sup. Ct. 1890), affirmed 53 N.J.L. 658 (E. & A. 1891), which was a contest over the election of a county clerk. Allegations were made that the miscounting of ballots in the district had changed the election. The question certified on appeal was whether the election statute giving power to the circuit court to determine an election contest was constitutional in view of the fact that the Supreme Court had exclusive jurisdiction under the Constitution to try title to office by quo warranto. The court, speaking through Chief Justice Beasley, held:
*196 "* * * this act under consideration, when properly construed, does not transfer to the county circuit court any part of that prerogative power of this court of which we have been treating. The procedure which it establishes is to be regarded simply as a part of the apparatus for organizing the government, by supplying it temporarily, and in view of a pressing public necessity, with its necessary members. In its purpose and nature it is similar to the power exercised by the judges of election and the county canvassers. It may, in fact, be said to be a supplement to such machinery; the object of it and the other agencies just referred to, being the same,  that is, to put into office for the time being such candidates as appear to have been chosen by the people.
This construction excludes, of course, the idea that the procedure has any conclusive effect, and, regarding it in this light, it appears to be, in a constitutional point of view, unobjectionable, at least so far as it is employed merely as an electoral adjunct. Plainly, the judgment rendered in such procedure would not oust this court of its jurisdiction subsequently to try the title to the office by quo warranto." (52 N.J.L., at pp. 443, 444)
In accord with this position are also the cases of Darling v. Murphy, 70 N.J.L. 435 (Sup. Ct. 1904), and In re Ray, 26 N.J. Misc. 56, 56 A.2d 761 (Cir. Ct. 1947).
The new Constitution of 1947 carried over to the Superior Court all the prerogative writ power vested in the old courts. The elimination of the specific writs and in their place the substitution of a proceeding in lieu thereof did not abolish the substantive case law concerning the former writs except to do away with the technical distinctions. The philosophy which guided the court in Watters v. Mayor, etc., of Bayonne, 89 N.J. Eq. 384 (Ch. Div. 1918), should govern in our present situation. That was an action to enjoin the purchase of a waterworks on a certain bond issue. The court allowed the suit even though a statute provided that after 20 days the bond issue was conclusively presumed valid. The reasoning was that assuming the validity of the issued bonds, there is nothing to prevent a court of equity from enjoining the city from using the proceeds in such a manner as will violate any equitable right of the inhabitants of the municipality. Vice-Chancellor Lane, speaking for the court of equity, found justification for its decision because "[i]n many cases the fraud may not be discovered, or be discoverable, until after the expiration *197 of the short period fixed by the statute." The Superior Court has all the powers, both equitable and legal, necessary to properly adjudicate this matter.
These cases clearly demonstrate that this court has jurisdiction to entertain a taxpayer's suit to prevent the disbursement of public funds, the approval of which was falsely reported by the election workers on the returns on the referendum in question, notwithstanding the fact that the time for an election contest under N.J.S.A. 19:29-1 et seq., has passed. It follows that having jurisdiction independent of Title 19 of the Revised Statutes, the court is free to receive any proper evidence relevant to this issue. There appears no reason to exclude the evidence of the actual returns, as elicited from the testimony of Mr. MacPhail and Mr. Herlihy. Their testimony and their credibility were unimpeached. As a matter of fact, the truth of their testimony has been conceded by defendants, thus saving the court the necessity of viewing the actual machines at the warehouse, which had been placed in evidence by the plaintiffs. The investigation and recheck of the machines on January 7, 1963 took place as part of an official investigation which culminated in a grand jury probe and presentment.
R.S. 19:34-62 requires the prosecutor to investigate all violations of the election laws and to present any evidence which he can gather to the grand jury. This court has determined that its jurisdiction in this matter is not dependent upon Title 19, even though the issue in controversy requires a determination of the actual vote of an election. There are no sections of Title 19 which would prohibit the admission of the evidence received here. Those sections of the election law which prohibit the opening of the voting machines without an order of the court are intended to insure the inviolability of the machines pending either a recount under N.J.S.A. 19:28-1, or an election contest under N.J.S.A. 19:29-1. This proceeding, however, is neither a recount nor an election contest.
*198 N.J.S.A. 19:52-6 requires that the machines be locked by the election district workers at the close of polling and not be opened except by order of a Superior Court judge for 15 days after the election. After the 15 days the requirement of a court order is not necessary under this section.
N.J.S.A. 19:32-11 allows the superintendent of elections to seal the machines in his discretion. When so sealed they "shall not be opened and the seal thereof destroyed or affected without an order first had and obtained from a Judge of the Superior Court assigned to the County." N.J.S.A. 19:18-8 is of similar import. The seals in the present case were never broken and are still intact. So that even if these sections, N.J.S.A. 19:18-8 or 19:32-11, were applicable in the instant case, which I do not hold, they were not violated in such a way as to prejudice the rights of the defendants. I further make a finding that the defendants were not prejudiced by their absence at the time the superintendent of elections and commissioner of registrations, Mr. MacPhail, and the prosecutor's detective, Mr. Herlihy, attended at the warehouse and examined the machines. Furthermore, the testimony of Mr. MacPhail concerning the operation of the voting machines shows not only that no actual prejudice to defendants occurred by reason of their absence at the recheck on January 7, 1963, but also that there is not even the possibility of any prejudice.
An analysis of the mechanical safeguards of the voting machines conclusively establishes that fact. The protective counter and the automatic latch lock, coupled with the seals which remain unbroken to this date, rule out even the possibility of having changed the digits on the machines after the election. The protective counter records the total number of votes cast on the machine during its lifetime. By comparing the numbers taken from the protective counter at the close of the election, which were recorded by the election district workers on their tally sheets, with the count taken on January 7, 1963 by Mr. MacPhail and Mr. Herlihy, it can be determined that no additional votes were recorded on these machines after *199 the closing of the polling on November 6, 1962. Moreover, the automatic latch is a protective device which automatically locks the machine if the back doors are ever opened after any votes have been cast. Once the back door is opened, as it must be at the close of the polling to view the results, this lock prevents further voting until the machine is cleared and reset.
There are three seals on each machine which was used in the Hoboken election. Each machine prior to the election was cleared and the digits set at "zero." There are one seal on the front of the machine and two seals are on the rear of the machine. The front seal was broken at the polling place to allow use of the machine. After the voting closed, the district workers placed their own numbered seal on the machine in place of the one which was broken. These seals are numbered and there are no duplicates. The front seals which were placed on the machines by the election workers can be identified as their seals by the numbers on the tally sheet. They are still intact today. The seals which were placed on the rear of the machine before it was sent to Hoboken were not touched and they can be identified as the same seals. They also are still intact today.
A machine cannot be reset except by breaking the seals and using five keys and a special tool. The keys to the machines were never in the possession of anyone except Mr. Fraser, the custodian of the warehouse, who had them until mid-November 1962, and thereafter they were in the possession of the superintendent of elections, Mr. MacPhail. The seals, as I have already set forth, were not broken. So even if N.J.S.A. 19:18-8 or 19:32-11 were applicable, which I hold they are not, these sections were not violated in such a way as I have already indicated as to prejudice the rights of the defendants.
One more point calls for comment. The court recognizes the seeds which nurtured the social mischief present in this election. However, the way to reform the situation is by educating the public and the lawmakers. It can never serve as a justification for profaning the sacredness of the ballot *200 and raiding the public treasury. Our form of jurisprudence can never countenance a philosophy that the ends justify the means. I find and determine on the totality of the evidence before me that there was fraud, misconduct or corruption in the reporting of the election results on the Public Question No. 2 in the City of Hoboken on November 6, 1962, providing proposed pay raises for members of the police department of that municipality.
I conclude that principle as well as precedent dictate that judgment be entered for plaintiffs and that a permanent injunction be granted restraining the City of Hoboken from paying, and the policemen from receiving, any increases proposed under the referendum, Public Question No. 2, which was on the ballot on November 6, 1962, in the municipality of Hoboken.