WOODBRIDGE STATE SCHOOL PARENTS ASSOCIATION, A NON-PROFIT NEW JERSEY CORPORATION, RICHARD M. ALLEN ITS PRESIDENT AND ROBERT DECOTIIS, INDIVIDUALLY AND ON BEHALF OF THE CLASS HE REPRESENTS AT WOODBRIDGE STATE SCHOOL, BY HIS GUARDIAN AND GUARDIAN AD LITEM, FAITH DECOTIIS, PLAINTIFFS, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, ADMINISTRATIVE COUNCIL 1, NEW JERSEY; ALFRED WURF; JACK MERKEL; HAROLD ADAMS; ELIZABETH LYONS; AND FREDERICK SINGLETON, DEFENDANTS.

Superior Court of New Jersey
Chancery Division Middlesex County

Decided July 8, 1981.

*Robert J. Greenwood* for plaintiffs (*Greenwood & Sayovitz,* attorneys).

*Emil Oxfeld* for defendants (*Rothbard, Harris & Oxfeld,* attorneys).

COHEN, J. S. C.

Plaintiffs brought this action to enjoin work stoppages at Woodbridge State School by employees represented by the American Federation of State, County and Municipal Employees (AFSCME). They also sought damages for two work stoppages, each a few hours long, that occurred in 1979 and no longer threaten the orderly operation of the school. A new period of employee unrest has just passed, however, during which AFSCME workers struck other state hospitals and residential facilities for brief periods. For that reason, the matter ought not be treated as moot. Additionally, what really divides the parties is the proper role of plaintiffs in the operation of the

school. That issue deserves attention in the hope of avoiding the kinds of confrontations that have occurred in the past involving the association, managing officials and workers.

Woodbridge State School is a residential facility housing some 1,000 profoundly and severely retarded persons of all ages. Their average I.Q. is 20. Many of them are physically handicapped as well. Their stays at the school are usually lengthy ones. They need constant direct care and professional attention. Plaintiffs are a school resident, his natural guardians [1] and a nonprofit corporation called Woodbridge State School Parents Association.

The Association considers as members the family of every resident, whether or not it expresses a wish to be so considered and whether or not it pays Association dues. In recent years the dues-paying membership has varied from 150 to 300. The actual life of the Association rests in the hands of a much smaller number of active participants. Its purpose has been to better the lives of the residents. It has organized school activities, provided school equipment and has sought to be represented on policy-making bodies and to participate in management decisions. The Association does not purport to represent the public interest in this action. Rather, it claims the right to assert the interests of school residents and their families. *See New Jersey State Bar Ass'n v. Northern N. J. Mfg. Associates*, 22 *N.J.* 184 (1956); *New Jersey Optometric Ass'n v. Hillman-Kohan*, 144 *N.J.Super.* 411 (Ch.Div.1976), aff'd 160 *N.J.Super.* 81 (App.Div. 1978).

AFSCME represents about half of the 1,500 employees of Woodbridge State School. They are nonprofessionals who provide direct physical care to the residents. They are state employees and, as such, are not permitted to strike. *Union Beach Bd. of Ed. v. N. J. E. A.*, 53 *N.J.* 29 (1968). Their role at

---

[1] The complaint alleged representation of a class but no effort was ever made to gain certification. R.4:32–1.

the school is an essential one. Their absence from their duties can create dangers of serious injury and distress to residents and total disruption of school program. The brief work stoppages from which this suit arose in 1979 created those dangers. Plaintiffs attempted to prove at trial that injury and disruption had in fact taken place, but totally failed to show any injury to any plaintiff or other represented person. For that reason the claim for damages contained in the complaint must be dismissed. I therefore need not rule whether a union and its leaders may be held liable for personal injury arising out of an organized withholding of public services.[2]

Plaintiffs argue that they represent the people for whose care AFSCME members are employed; that they are third-party beneficiaries of the contract between the State and the AFSCME members; that the withholding of services at the school creates life-threatening perils to the residents and they therefore have standing to seek judicial enforcement of defendants' duty not to create work stoppages.

The issue is one that has received little reported judicial attention. An Illinois court has ruled that the parents of public school children had no right to seek injunctive relief against a teachers' strike and that only the school district could do so. *Allen v. Maurer*, 6 *Ill.App.*3d 633, 286 *N.E.*2d 135 (App.Ct.1972). The Florida Supreme Court dealt, in *Dade County Classroom Teachers Ass'n v. Rubin*, 217 *So.*2d 293 (1968), with an issue of entitlement to jury trial in a school strike contempt proceeding. It mentioned that the underlying injunction had been sought and obtained by a public school child's representative parent. The court carefully said, however, that it would not rule on the plaintiff's right to bring the suit.

---

[2] *See Isbrandtsen Co. v. Local 1291*, 204 *F.*2d 495 (3 Cir. 1953); *Titus v. Jacoma Smelterman's Union Local # 25*, 62 *Wash.*2d 461, 383 *P.*2d 504 (Wash.Sup.Ct.1963); *Caso v. District Council 37*, 43 *A.D.*2d 159, 350 *N.Y.S.*2d 173 (App.Div.1973); *Compare Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 *S.Ct.* 1318, 8 *L.Ed.*2d 462 (1962).

A New York trial court has ruled that a Nassau County Executive and Supervisors of Municipalities in Nassau County could seek to enjoin a strike by New York City pollution control workers that was causing contamination of Nassau County beaches and waters. *Caso v. Gotbaum*, 67 *Misc*.2d 205, 323 *N.Y.S*.2d 742 (Sup.Ct.1971). Although the result lends support to plaintiffs' position here, there were important added elements in *Caso*. The pollution involved there violated state law wholly apart from the legality of the strike.[3] It was the unlawful pollution that the court enjoined. Additionally, the plaintiffs were public officials discharging their duties by seeking to protect the people and territory they served. The decision was later reversed on other grounds, 38 *A.D*.2d 955, 331 *N.Y.S*.2d 507 (App.Div.1972).

I am unaware of any other reported case treating the problem in New Jersey or elsewhere. Neither extreme position is entirely satisfactory. If the intended beneficiaries of public service can never seek to bar public work stoppages, they may suffer from lack of urgently needed services without any recourse at all. If, for one reason or another, the public employer will not seek enforcement, no one else can do so. On the other hand, if the intended beneficiaries can always seek independently to bar public work stoppages, they might frequently do so in circumstances in which the public employer reasonably wishes to avoid that confrontation. In those circumstances the most impatient beneficiaries could take over management responsibilities. That is an impermissible alternative. Therefore, I hold that plaintiffs have no standing to seek an order barring work stoppages. Only the State, as employer, has the right to do

---

[3] Plaintiffs here assert special standing arising out of *N.J.S.A.* 30:4–24.2, the Patient's Bill of Rights. But does not every citizen have the right to essential services? The issue is not whether the right exists but whether enforcement more appropriately lies against the public body obliged to satisfy the right or against the employees it hires to perform its function.

that.[4]  Plaintiffs may seek only an order requiring the State to sue for judicial enforcement of the duties owed to it by its employees.  See *Colon v. Tedesco*, 125 *N.J.Super.* 446 (Law Div.1973).

The State finances, owns and operates the school.  It employs the AFSCME members.  It negotiates their terms and conditions of employment.  It restricts, by law and contract, their right to withhold services.  It provides PERC as a forum for the disposition of public employment disputes.  And yet the State is not even a party to this action.  See *R.* 4:28.  The State is at least as well positioned as plaintiffs to seek court sanctions against work stoppages, to judge the gravity of the effect of the withholding of public services, and to determine when and how it may be most appropriate to act.  The State is primarily entrusted with the protection of the health and safety of the school residents.  A court should not assume that responsibility unless the State is clearly failing to do its job.

■  It is not now the time to say what circumstances may oblige a public employer to seek judicial relief from a work stoppage.  When it is so obliged, an order of *mandamus* may properly require it to act.  *Territo v. United States*, 170 *F.Supp.* 855 (D.N.J.1958), app. dism. 358 *U.S.* 279, 79 *S.Ct.* 312, 3 *L.Ed.2d* 298 (1959), motion denied 359 *U.S.* 963, 79 *S.Ct.* 875, 3 *L.Ed.2d* 832 (1959).  It is not obliged to react fully to every work stoppage, but has discretion to refrain from seeking court sanctions in cases that seem suitably managed in other ways.  The employer may well be obliged to go to court in those cases in which work stoppage creates real and present dangers to public health and safety or to the welfare of the intended beneficiaries of public services.  I emphasize that I do not decide when *mandamus* may lie: I merely hold that *mandamus* is plaintiffs'

---

[4]The question is not presented here whether the Attorney General may have standing to seek relief on behalf of the public from a strike against a local public employer.

only remedy. There are two reasons. The first is that if the State has the discretion to withhold enforcement in some or all instances, it can effectively exercise its judgment to do so only if other interested parties are obliged to stand aside. If employer discretion should exist, it must be permitted to control. Second, if the State has the obligation to act, the institutions of government are best served by requiring it to do its job and not by diluting public responsibility with the alternative of private enforcement.