687 A.2d 1091

LARRY S. LOIGMAN, ESQ., PLAINTIFF–RESPONDENT, v. THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MIDDLE-TOWN, DEFENDANT–APPELLANT, AND MIDDLETOWN TOWNSHIP SUPERIOR OFFICERS ASSOCIATION, DEFEN-DANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 16, 1996—Decided February 6, 1997.

288

Before Judges PETRELLA, WALLACE and KIMMELMAN.

*Bernard M. Reilly* argued the cause for appellant (*Dowd & Reilly,* attorneys; *William F. Dowd,* on the brief).

*Larry S. Loigman,* respondent, argued pro se.

*Sidney H. Lehmann* argued the cause for respondent Middletown Township Superior Officers Association (*Szaferman, Lakind, Blumstein, Watter & Blader,* attorneys; *Mr. Lehmann,* on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

The principal issue on appeal is whether a resident and taxpayer of a municipality has standing to bring an action to enforce a collective negotiation agreement between a public employer and a public employee union.[1] Stated differently, this appeal tests the limits to taxpayer standing in this State and whether a non-party to a labor agreement can intervene to enforce an interpretation of

---

[1] *See N.J. Const.* art. I, ¶ 19, and *N.J.S.A.* 34:13A–5.3; *see also N.J. Turnpike Emp. Union v. N.J. Turnpike Auth.,* 64 *N.J.* 579, 581, 319 *A.2d* 224 (1974) (distinguishing collective negotiation rights reserved to public employees as opposed to "collective bargaining" in the private arena).

a contract provision and require expenditure of public funds thereunder.

Plaintiff Larry S. Loigman, a resident and taxpayer of the Township of Middletown, instituted suit to enforce a collective negotiation agreement between the Township of Middletown (Township) and the Middletown Township Superior Officers Association (SOA)[2] when the Township refused to implement a "Me Too" pay differential or parity clause in the agreement. That clause provides that each rank of superior officer would earn at least 12.5% more than its immediately subordinate rank.

The Law Division Judge rejected the Township's argument that Loigman had no standing to bring this suit and granted his motion for summary judgment without requiring a showing of "specific harm." In granting the motion, the judge refused to consider the validity of the "Me Too" clause, noting that the Public Employment Relations Commission (PERC) had primary jurisdiction. However, his decision had the effect of implementing that clause without ruling on its validity.[3] The judge also concluded that the agreement remained in effect because neither party to it had notified the other of its cancellation, as required by Article XXIX of the agreement.

On appeal the Township challenges the judge's determination that Loigman had standing to sue. It also argues that the judge improperly determined that the collective negotiation agreement

---

[2] This union represented police officers of the rank of sergeant and above.

[3] In rejecting the Township's arguments the judge said:

> [I]t is this Court's finding that questions regarding legality of the differential clause must be first brought to the PERC for resolution. Until such issue is brought before PERC and a determination made upon the legality of the differential clause, this Court must assume it to be legal.
>
> Based upon the foregoing, this Court finds that members of the SOA are entitled to the 12 and a half percent differential as bargained for in their contract. Such contract is not expired as no notice has been properly given by any party. And even if such contract had expired, until a new contract has been negotiated, the current terms control.

between it and the SOA was still in effect; and erred in failing to find the "Me Too" clause illegal and unenforceable.

We agree with the Law Division Judge that the agreement was still in effect because no steps were ever taken to cancel it, although we express concern about the very limited window of opportunity for termination. The judge also correctly determined that the validity of the "Me Too" provision of the agreement is an issue in the first instance for PERC. However, we conclude for the reasons hereinafter stated, that a taxpayer lacks standing to enforce a public sector labor agreement, as opposed to challenging any potential illegality of that agreement.

The Township adopted Ordinance 92–2314 in December 1992, approving salaries, increments and fringe benefits for the SOA, and incorporating the collective negotiation agreement for 1991 and 1992 between it and the Township. Article XXIII of this agreement, "Salary" provided: "Effective January 1, 1991, every SOA member will receive a base salary equal to the highest base salary paid to his immediate subordinate rank plus a differential of twelve-and-one-half (12½) percent." [4]

The agreement provided in Article XXIX, "Duration":

A. The term of this agreement shall be from January 1, 1991 through December 31, 1992.

B. In the absence of written notice given not more that [sic] one hundred eighty (180) nor less than one hundred fifty (150) days prior to the expiration date by either party, this agreement shall automatically be renewed for a period of another year, and from year to year thereafter, until such time as appropriate notice is given prior to the annual expiration in accordance with the terms of this article.

C. If, following receipt of such notice, negotiations have not been completed prior to termination date, this agreement may be extended for an additional thirty (30) days from its termination date, upon fifteen (15) days notice in writing by either party to the other.

D. In such event, however, and if an extension is accepted, any changes made shall be effective as of the expiration date. If the parties fail to reach an

---

[4] The Township refers to this provision as the "Me Too" clause. We use that term merely as a matter of convenience.

agreement either before the termination of the date the extended period terminates, this agreement shall terminate.

Loigman's complaint in lieu of prerogative writs named the Township and the SOA as party defendants. According to his complaint, no written notice of termination of the agreement was ever given, and Ordinance 95-2402, adopted in April 1995, set salaries, increments and fringe benefits for police officers represented by the local Patrolmen's Benevolent Association (PBA) [5] for 1993, 1994, and 1995. Despite the PBA's salaries being set, superior officers did not receive the percentage differential stated in the Township–SOA agreement, but continued to be paid at 1992's annual rate.

The president of the SOA asserted in a certification filed in support of the summary judgment motion, that the Township refused to negotiate with the SOA until negotiations were completed with the PBA. The unsuccessful negotiations between the Township and the PBA resulted in interest arbitration and an award in favor of the PBA. The PBA sought court confirmation of the award and its members did not receive their 1993, 1994 and 1995 raises until after the Chancery Division confirmed the award.[6]

Although the Township admitted that it passed the ordinances and assented to the collective negotiation agreement, it accused Loigman and the SOA of seeking to obtain from the court what it asserts they could not obtain from PERC—enforcement of the "Me Too" clause. Apparently, after Loigman filed suit the Township's counsel for the first time researched the issue and came to

---

[5] The Police Benevolent Association local chapter is the union for the patrolmen in Middletown.

[6] We affirmed the Chancery Division's confirmation of the interest arbitration award with respect to the PBA contract. *Police Benevolent Ass'n Local 124 v. Township of Middletown*, No. A–2688–94 (App. Div. April 25, 1996). As to interest arbitration, see also *Hillsdale PBA Local 207 v. Borough of Hillsdale*, 137 *N.J.* 71, 644 *A.2d* 564 (1994) and *Washington Tp. v. New Jersey PBA, Local 206*, 137 *N.J.* 88, 644 *A.2d* 573 (1994).

the opinion the clause was unenforceable. The Township denied receiving any benefit from the parity clause, and argued that estoppel should not be applied against a municipality. Additionally, the Township contested Loigman's standing to bring an action which interfered with labor negotiations and matters properly before PERC, where Loigman could not assert a claim; and also because some citizens might disagree with his position.

In connection with the Township's application for a stay of the judgment and of the SOA's enforcement order, the judge refrained from ruling on the merits of the pay differential clause because he considered the issue not within his jurisdiction, but rather that of PERC. He found, however, that the employment contract had neither lapsed nor been rescinded and ordered that the superior officers' retroactive raises be paid by September 8. Although another part of this court denied the Township's emergent application for a stay, on September 20 the Supreme Court granted a partial stay, pending determination of the appeal, of so much of the trial court's order that required payment of the salary increases retroactive to July 10, 1995.

Meanwhile, on or about September 6, the Township filed an unfair labor practice petition with PERC, asserting that the SOA committed an unfair practice "[b]y ignoring its contractual obligation to seek PERC's review of its position," and by using "the ruse of the Loigman 'citizens' lawsuit" to obtain a judicial ruling. The Township requested that PERC declare the "Me Too" clause illegal, and impose interim emergent relief preserving the status quo. On September 8, PERC declined to hear the matter because "the Superior Court has asserted jurisdiction over this matter and therefore the Public Employment Relations Commission is without jurisdiction."

## I.

New Jersey has a broad definition of standing when it comes to challenging governmental actions, and our courts are not confined by the "case or controversy" requirement under Article

III, § 2 of the United States Constitution. *Salorio v. Glaser*, 82 *N.J.* 482, 490, 414 *A.*2d 943 (1980). Moreover, our Rules of Court concerning prerogative writs, 4:69–1, *et seq.*, reflect a commitment to allowing appropriate citizen challenge in lieu of the old common law writs, *e.g.*, mandamus, quo warranto, and certiorari.[7] *Alexander's Dept. Stores of New Jersey v. Borough of Paramus*, 125 *N.J.* 100, 107, 592 *A.*2d 1168 (1991); *In re LiVolsi*, 85 *N.J.* 576, 594, 428 *A.*2d 1268 (1981). While this is so, the ability of taxpayers to challenge governmental action is not unlimited. Taxpayers may not assert the constitutional rights of another. *In re Quinlan*, 70 *N.J.* 10, 34, 355 *A.*2d 647 (1976), *cert. denied sub nom. Garger v. New Jersey*, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976); *N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Commission*, 82 *N.J.* 57, 67, 411 *A.*2d 168 (1980); *Matlack v. Burlington County Freeholders Board*, 191 *N.J.Super.* 236, 248–249, 466 *A.*2d 83 (Law Div.1983), aff'd, 194 *N.J.Super.* 359, 476 *A.*2d 1262 (App.Div.1984). "[W]e will not render advisory opinions or function in the abstract nor will we entertain proceedings by plaintiffs who are 'mere intermeddlers or are merely interlopers or strangers to the dispute.'" *Crescent Pk. Tenants Ass'n v. Realty Eq. Corp.*, 58 *N.J.* 98, 107, 275 *A.*2d 433 (1971). There must be a substantial likelihood the plaintiff will experience some harm if the court returns an unfavorable decision. *N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n, supra*, 82 *N.J.* at 67, 411 *A.*2d 168.

▮ Generally, taxpayer intervention is appropriate where there are claims of fraud or corruption, *see Driscoll v. Burlington–Bristol Bridge Co.*, 8 *N.J.* 433, 474–476, 86 *A.*2d 201, *cert. denied*, 344 *U.S.* 838, 73 *S.Ct.* 25, 97 *L.Ed.* 652 (1952), or other instances of illegalities and *ultra vires* acts. *National Waste Recycling, Inc. v. Middlesex Cty. Imp. Auth.*, 291 *N.J.Super.* 283, 289, 677 *A.*2d 268 (App.Div.), *certif. granted*, 146 *N.J.* 565, 683 *A.*2d 1161 (1996); *Matlack v. Burlington Cty. Freeholders Bd., supra*, 191 *N.J.Su-*

---

[7] Other writs include habeas corpus, reserved for criminal matters; procedendo, remanding to inferior court; and prohibition, removing jurisdiction from an inferior court.

*per.* at 254, 466 *A.*2d 83; *Koons v. Bd. of Com'rs of Atlantic City,* 134 *N.J.L.* 329, 47 *A.*2d 589 (Sup.Ct.1946), *aff'd,* 135 *N.J.L.* 204, 50 *A.*2d 869 (E. & A.1947). Also, in zoning matters, landowners are permitted to seek review of local legislative or quasi-judicial action without proof of unique financial detriment to them. *See Kozesnik v. Tp. of Montgomery,* 24 *N.J.* 154, 177, 131 *A.*2d 1 (1957). Other situations where taxpayers may challenge governmental action involve claims of illegal bidding procedures. *L. Pucillo & Sons, Inc. v. Tp. of Belleville,* 249 *N.J.Super.* 536, 592 *A.*2d 1218 (App.Div.), *certif. denied,* 127 *N.J.* 551, 606 *A.*2d 364 (1991).

■ In addition, taxpayers have standing to challenge wrongful expenditures by their governing body. *See Nolan v. Fitzpatrick,* 9 *N.J.* 477, 484, 89 *A.*2d 13 (1952). In this setting, a taxpayer had standing to challenge salary increases of public employees by challenging the legitimacy of the referendum which authorized the increases. *Theurer v. Borrone,* 81 *N.J.Super.* 188, 193, 195 *A.*2d 215 (Law Div.1963). For obvious reasons such is not the case where a taxpayer suit seeks to compel expenditures of public funds. While permissible taxpayer suits generally seek to prevent municipalities from disbursing funds, Loigman who is not a party to the labor contract, seeks to enforce a contractual provision and require governmental expenditures. If individual taxpayers with multiple competing interests were able to bring suit in such situations, they could cripple the government's ability to function properly. In addition, responsibility for labor relations matters is better left in the first instance to PERC and not arrogated to the medium of taxpayer suits.

In some public sector labor cases involving exercises of "legislative or quasi-legislative power," union intervention on behalf of teachers has been allowed to challenge a board of education policy limiting employment of supplemental teachers to two consecutive years. *Ridgewood Education Ass'n v. Ridgewood Board of Education,* 284 *N.J.Super.* 427, 665 *A.*2d 776 (App.Div.1995). Similarly, a challenge by a trade organization was allowed where individu-

als or trade groups were affected by a local ordinance relating to the sale of property. *Ocean County Board of Realtors v. Borough of Beachwood,* 248 *N.J.Super.* 241, 590 *A.*2d 736 (Law Div.1991). In such cases the restrictions imposed by public entities were being challenged as unlawful.

The concept of standing takes on a different light when government entities and public employees are involved in labor negotiations and disputes. There is little doubt that the SOA could challenge the Township's interpretation of the agreement, and that PERC would be the appropriate initial forum. *See City of Hackensack v. Winner,* 82 *N.J.* 1, 410 *A.*2d 1146 (1980). Indeed, *L.* 1968, *c.* 303, and its progeny, provide a discrete mechanism for public entity labor negotiation situations. *See N.J.S.A.* 34:13A–5.1 *et seq.,* as amended.

There is scant discussion in our case law of taxpayer standing with regard to public sector labor agreements. Judge Richard Cohen in *Woodbridge State School Parents Ass'n v. American Federation of State, County and Municipal Employees,* 180 *N.J.Super.* 501, 435 *A.*2d 855 (Ch.Div.1981), concluded in an incisive decision, with which we agree, that a parents' association did not have standing to intervene in a labor dispute between employees at the Woodbridge State School and the governmental entity responsible for the school's operation. The association sought damages for two work stoppages, which were essentially illegal because the employees were governmental employees who are not permitted to strike. *Id.* at 503, 435 *A.*2d 855. *Cf. Bd. of Ed. of Voc. School of Sussex v. Sussex Voc–Tec. Teachers Education Ass'n,* 170 *N.J.Super.* 426, 406 *A.*2d 989 (Ch.Div.1979).

In denying standing to the plaintiffs in *Woodbridge,* Judge Cohen in part relied on *Allen v. Maurer,* 6 *Ill.App.*3d 633, 286 *N.E.*2d 135 (1972). There, as in *Woodbridge State School Parents Ass'n,* the court held that taxpayer-parents lacked standing to enjoin strikes by teachers in order to secure performance of the State's duty to maintain a public school system. The Illinois Appeals Court recognized that the situation before it was *not a*

case of alleged misuse of public funds or conveyance of public property, and denied standing because:

> If standing were conferred upon parents of school children in a case such as this, one could conjure up a multitude of situations in which the desires of a few individual parents could conflict with the action of the School Board. While we recognize that parents have an abiding and a legitimate concern in the outcome of a dispute such as the one presented by this appeal, we do not feel that the interest is the equivalent of, or bestows legal standing to sue.
>
> [*Id.* at 140, 286 *N.E.*2d 135].

This reasoning is particularly apposite in the context of a public sector labor dispute. So too is Judge Cohen's reasoning in *Woodbridge State School Parents Ass'n v. AFSCME, supra,* that "the most impatient beneficiaries could take over management responsibilities," if standing were granted. *Id.* at 505, 435 *A.*2d 855. Indeed, the present case, involving as it does sensitive labor negotiations between the public employer and its employees, concerns management prerogatives of the executive "arm" of local government. There is no overriding reason to allow a taxpayer to usurp management responsibilities for the adoption and implementation of a labor agreement between a public employer and its employees or to supplant PERC or this State's public sector labor laws.[8] Allowing a taxpayer to have standing to bring suit would frustrate the legislative intent to have such matters resolved by PERC.

Support for our conclusion that a taxpayer lacks standing for what on the state or county government level would be the equivalent of an executive branch responsibility and prerogative to contract with public employees is found in *Matlack v. Burlington County Freeholders Board, supra,* 191 *N.J.Super.* at 248–249, 466 *A.*2d 83. In *Matlack,* certain taxpayers and residents of the county were held not to have standing to challenge the purchase price of Pinelands Development Credits as violative of due process and just compensation rights. The taxpayers asserted no special

---

[8] Judge Cohen commented in *Woodbridge School Parents Ass'n v. AFSCME, supra,* 180 *N.J.Super.* at 506, 435 *A.*2d 855, that a taxpayer might be able to seek mandamus in situations involving work stoppages by public employees.

damages, were not potential sellers of credits, and were deemed "mere interlopers" and strangers to any potential sale of credits. *Ibid.*

Our research has not disclosed, and the parties have not cited, precedent allowing intervention by a taxpayer who is not a participant nor directly affected by the labor negotiations.[9] Nor does this case have the "slight additional private interest" to afford standing to Loigman in such a situation. *See Salorio v. Glaser, supra,* 82 *N.J.* at 491, 414 *A.*2d 943. Here the Township and the SOA were attempting to negotiate a new contract when Loigman sought enforcement of a provision under the previous contract. Under these circumstances, there is no "great public interest" or special or additional private interest to justify standing for Loigman to pursue this action.

 Finally, Loigman's filing of a complaint in lieu of prerogative writs is a misapplication of the common law writ of mandamus. Mandamus is a proper remedy: (1) to compel *specific* action when the duty is ministerial and wholly free from doubt, and (2) to compel the exercise of discretion, but *not* in a specific manner. *Switz v. Middletown Tp.,* 23 *N.J.* 580, 130 *A.*2d 15 (1957); *Colon v. Tedesco,* 125 *N.J.Super.* 446, 311 *A.*2d 393 (Law Div.1973); *Borough of Eatontown v. Danskin,* 121 *N.J.Super.* 68, 296 *A.*2d 81 (Law Div.1972); *Edelstein v. Ferrell,* 120 *N.J.Super.* 583, 295 *A.*2d 390 (Law Div.1972).

Hence, a prerogative writ action in lieu of mandamus, seeking an order compelling governmental action, would usually not be appropriate unless there was a clear and undisputed ministerial duty or general exercise of discretion involved. Loigman's suit to compel the Township to exercise its discretion in a specific manner with respect to a disputed provision of a labor agreement does not

---

9 Indeed, even union members do not necessarily have standing where represented by a collective negotiation unit. *N.J. Turnpike Emp. Union v. N.J. Turnpike Auth.,* 123 *N.J.Super.* 461, 467, 303 *A.*2d 599 (App.Div.1973), *aff'd,* 64 *N.J.* 579, 319 *A.*2d 224 (1974).

fall within what had been the prerogative writ of mandamus. Loigman not only lacks standing to interfere in the Township–SOA labor contract, but his use of a prerogative writ suit in such a manner is inappropriate.

## II.

Although our disposition of the standing issue is in a sense determinative, because of the nature and course of the proceedings below some additional comment is warranted. The Township contends that its agreement with the SOA was no longer in effect. The Township acknowledges that it never formally rescinded the agreement in accordance with Article XXIX, which requires written notice of termination between 180 and 150 days prior to its December 31 annual expiration date.[10] The Township maintains that its failure to repeal, revoke or modify the agreement is a "thin procedural reed[ ]" because it and the SOA treated the agreement as lapsed or rescinded by proceeding to negotiate. It argues that if the agreement remained in effect, there would be nothing to negotiate and that the SOA's failure to seek enforcement of the parity clause until Loigman filed suit is further evidence that the agreement was revoked or rescinded.

Despite these assertions, it is clear that the agreement remained in effect because the Township failed to give any written notice under the contract which recites that absent such notice the "agreement shall automatically be renewed." Since no written notice was given, the agreement was automatically renewed.[11] *Galloway Tp. Bd. of Educ. v. Galloway Tp. Educ. Ass'n*, 78 N.J. 25, 393 A.2d 218 (1978) (requiring that the terms of the agreement remain in effect even if expired).

---

[10] This provision purports to permit termination only by notice in the month of July of the current contract year, effective at the end of the contract term, unless briefly extended per Article XXIX of the agreement.

[11] The SOA inappropriately relies on *N.J.S.A.* 34:13A–21. Since no proceedings were sought before an arbitrator here, this provision does not apply.

Absent illegality, fraud or overriding public policy, courts enforce a contract as written and do not write a better contract for the parties. *Kampf v. Franklin Life Ins. Co.*, 33 *N.J.* 36, 42, 161 *A.*2d 717 (1960); *Temple v. Clinton Trust Co.*, 1 *N.J.* 219, 225, 62 *A.*2d 690 (1948); *Karl's Sales and Serv., Inc. v. Gimbel Bros., Inc.*, 249 *N.J.Super.* 487, 490–497, 592 *A.*2d 647 (App.Div.), *certif. denied*, 127 *N.J.* 548, 606 *A.*2d 362 (1991) (where terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts enforce those terms as written and do not fashion a better contract for the parties than they themselves made).

The Township also contends that if the agreement remained in effect, the Law Division Judge erred in failing to enforce Article XXII, which requires binding arbitration for the settlement of grievances. However, Loigman was not a party to the agreement, and the Article XXII arbitration provision was not applicable to him. This reinforces our determination that he lacks standing to interfere in this labor dispute.

### III.

The Article XXIX termination provision requiring written notice between 180 and 150 days prior to the agreement's annual expiration date of December 31 deserves comment. This provision essentially means that termination notice can only be given in the preceding month of July before the contract's end or the opportunity to prevent the contract from renewing automatically is lost for the remainder of that year and until July of the next "contract" year. Thus, the contract continues for at least a year and five months after July 31, if no written notice is given.

In the context of an attorney's retainer agreement, the Supreme Court addressed a similar one-month termination provision and found it severely restricted a client's right to terminate a lawyer-client relationship. Under this type of arrangement, the lawyer could claim entitlement for an additional year's retainer fee even if he performed no work. *See Cohen v. Radio–Electr. Officers*

*Union, District 3, NMEBA,* 146 *N.J.* 140, 679 *A.*2d 1188 (1996). Lawyer-client relationships exist in a similarly regulated environment as do public employer-public employee relationships.

In the public sector, and considering public policy and management prerogatives, restricting the termination opportunity to one month out of the year, or perhaps even one day, is problematic. It is one thing to say that a public entity has to give notice of termination,[12] but quite another thing to say that if it does not give it on a certain day or in a certain week or month (and not before), the parties are bound for another term. We merely highlight this issue and do not decide it.

## IV.

The Township contends that the pay parity or "Me Too" clause in the collective negotiation agreement is illegal and void, and that the judge erred in taking jurisdiction to enforce the agreement. The judge instructed the Township to ask PERC to determine the validity of the parity clause, but inappropriately retained primary jurisdiction by deciding the summary judgment motion. *Cf. City of Hackensack v. Winner, supra,* 82 *N.J.* at 34–38, 410 *A.*2d 1146. Thereafter, PERC declined jurisdiction over the Township's unfair practice petition because the Superior Court had assumed jurisdiction to rule on the matter, even though the Township, the SOA and the judge agreed that PERC had primary jurisdiction to determine the validity of the parity clause.[13]

---

[12] It might be asked why notice of termination is needed at all if the labor agreement is for a fixed term. Under *Galloway, supra,* in the absence of a negotiated contract for a new term, the old contract terms would essentially continue until superseded.

[13] *N.J.S.A.* 34:13A–5.4(d) provides: "The commission shall at all times have the power and duty, upon the request of any public employer or majority representative, to make a determination as to whether a matter in dispute is within the scope of collective negotiations."

In *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.*, 78 *N.J.* 144, 393 *A.2d* 278 (1978), the Court asserted that when the controversy "concerns the propriety of the parties negotiating and agreeing on the item in dispute, [the trial judge] should refrain from passing on the merits of the issue," because "PERC has primary jurisdiction." *Id.* at 153–154, 393 *A.2d* 278. The judge did so here, but then inappropriately went on to presume the validity of the agreement. He should not have done so. Contrary to the Township's assertion, the judge never determined that the pay parity clause was valid; rather, he refrained from passing on the merits of its validity due to PERC's primary jurisdiction.

Despite PERC's primary jurisdiction, the judge was perhaps hampered in transferring the matter to PERC because Loigman was a party in the case. Apparently, severance was not considered. In *In re Tp. of Middletown*, 19 *NJPER* par. 24206 (1993), PERC determined that plaintiff did not have standing to file an unfair practice charge because he was not a "public employer, public employee, public employee organization, or their representative," as required by *N.J.A.C.* 19:14–1.1. *N.J.S.A.* 34:13A–5.4(d) similarly allows only public employers and majority representatives to request scope-of-negotiation decisions. PERC is not authorized to hear citizens' complaints. Clearly, this is because a citizen has no standing in a public employer-public employee dispute in a labor matter over which PERC has jurisdiction.

 The SOA argues that the Township waived its right to contest the validity of the pay parity clause and contends that the Township is estopped from raising this issue, since it received the benefit of the objectionable clause for two and one-half years, during which it did not pay any salary increments, and refused to negotiate. The Township did not question the validity of the pay parity clause until Loigman's suit was filed; failed to seek PERC's review of the objectionable clause, despite the judge's admonitions to do so until after the appeal was filed; and did not appeal PERC's decision. Despite this, we reject the estoppel argument. Estoppel should be sparingly applied against public entities.

*O'Malley v. Dept. of Energy,* 109 *N.J.* 309, 316, 537 *A.*2d 647 (1987). Since policy matters and the management prerogatives of a governmental unit are involved, estoppel is inappropriate.

In view of our disposition of this appeal, there is no basis for PERC to decline jurisdiction over a scope-of-negotiations petition to determine the validity of the disputed pay parity clause. *N.J.S.A.* 34:13A–5.4(d); *Ridgefield Park, supra* (78 *N.J.* at 153–154, 393 *A.*2d 278). We decline at this point to consider the validity of the "Me Too" clause pending PERC's consideration of that issue.

Reversed and remanded to PERC for appropriate proceedings.