41 A.3d 792 (2012)
425 N.J. Super. 422
TOWNSHIP OF NEPTUNE, Plaintiff-Appellant,
v.
STATE of New Jersey, DEPARTMENT OF ENVIRONMENTAL PROTECTION, Defendant-Respondent.
No. A-5573-09T3.
Superior Court of New Jersey, Appellate Division.
Submitted March 6, 2012.
Decided April 26, 2012.
*795 Gene J. Anthony, Eatontown, attorney for appellant.
Jeffrey S. Chiesa, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Alison M. Reynolds, Deputy Attorney General, on the brief).
Before Judges MESSANO, YANNOTTI and KENNEDY.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
On October 14, 2009, the Township of Neptune (Township) filed a complaint in the Law Division seeking an order requiring the State of New Jersey, Department of Environmental Protection (DEP), to "perform dredging" of State navigational channels within Shark River Bay by a date certain, and to provide a site for the temporary placement of the dredged materials. The trial court determined that the Appellate Division has exclusive jurisdiction in the matter under Rule 2:2-3(a)(2) and entered an order dated July 9, 2010, transferring the case to this court pursuant to Rule 1:13-4(a). For the reasons that follow, the Township's complaint will be dismissed with prejudice.

I.
The Township is situated along Shark River Bay (the Bay). According to the Township's complaint, the Bay has historically been used by the public for boating, fishing and water-related recreation. The federal Army Corps of Engineers (ACOE) maintains the federal navigational channels within the Bay from the Atlantic Ocean to and adjacent to Shark River Island, and the ACOE undertook certain dredging to maintain the navigability of those channels.
The Township claims that the DEP is responsible for the dredging of State navigational channels within the Bay. The Township maintains that the DEP has long encouraged public access to and enhancement of the State's waters and shorefront. In 2003, the Township applied to the DEP for a grant to make improvements to Lake Alberta, part of the headwaters of the Shark River, and in 2004 dredged Lake Alberta, in partnership with the Monmouth County Mosquito Commission. Moreover, in 2004, the Township adopted an ordinance that required developers to comply with certain stormwater management regulations, which allegedly provided "significant water quality protections for the Bay."
The Township asserts that, despite these efforts, there has been significant "siltation and stormwater runoff" into the Bay. It alleges that the State navigational channels within the Bay have not been dredged since 1980, and this has had negative environmental consequences and a negative impact upon commercial fishing and recreational boating.
The Township further claims that since at least 2004, the DEP and the New Jersey Department of Transportation (DOT) *796 have "induced" it to invest large sums of money to acquire and improve land along the Bay as a public marina recreational facility and wildlife habitat area. According to the Township, the DEP and the DOT provided assurances that the DEP would dredge the State navigational channels in the Bay and provide a site for the temporary placement of dredged material for "drying" or "dewatering."
On November 13, 2006, the Township acquired the Shark River Hills Marina, which had been privately owned, for $4.7 million. To purchase the marina, the Township used a $2.2 million grant from the DEP's Green Acres program, and $250,000 from the Monmouth County Open Space Program. The Township asserts that it expected to receive an additional $800,000 in Green Acres funds from the DEP, and it financed the balance of the cost through the issuance of debt.
The Township alleges that it spent a substantial amount of money to repair and improve the marina, which is now called the Shark River Municipal Marina. The Township also has requested additional funds from the New Jersey Environmental Infrastructure Trust to complete necessary repairs and improvements.
The Township claims that the Shark River and Bay are filling with silt from run-off from its bordering municipalities. It claims that, as a result of the lack of dredging, silt and sediment have accumulated within the State navigational channels in the Shark River and Bay, resulting in shallow water depths and compromised navigability. This condition has allegedly resulted in unsafe boating conditions, as well as negative impacts on the Bay's water quality, vegetation, wildlife and wildlife habitats.
In 2005, the DOT provided the Township with $20,700 for the creation of a sediment and dredged material management plan (DMMP) for the Bay. The Township retained an engineering firm, which issued the first draft of the DMMP in August 2005. A second draft was issued in November 2006, and it estimated that about 1,078,000 cubic yards of material must be removed from the Bay, which would require the dredging of 150,000 cubic yards of material each year for ten years.
The Township asserts that dredged material must be temporarily placed on land and dried, a process that takes about six months. The Township claims that a ten-acre site would be required for the dewatering of the dredged material. It asserts that a site in Wall Township had been identified in the final draft DMMP as a drying site.
The Township alleges that the DEP has failed to approve the final draft DMMP, and has failed to provide a site for the dewatering of the dredged material. The Township further alleges that the DEP has not dredged the State navigational channels of the Bay. It claims that, without dredging, boats are hindered from gaining access to the Township's marina and its redevelopment will not be economically viable.

II.
The State filed a motion in the trial court arguing that, because the Township is seeking review of final action or inaction of a State administrative agency, the Appellate Division had exclusive jurisdiction in the matter under Rule 2:2-3(a). The trial court agreed and entered an order transferring the case to this court. Thereafter, we granted the DEP's motion for a temporary remand to allow it to create a factual record addressing the Township's allegations. On remand, two reports were issued by the DEP.
*797 The DEP's Office of Dredging and Sediment Technology (ODST) issued a report dated August 2011. The ODST is responsible for all land use permits associated with dredging projects in New Jersey tidal waters and placement of dredged materials in this State. The ODST asserts that since 2005, it has attempted to assist in the identification of an acceptable site for dredged material from Shark River Bay.
The ODST notes that in August 2005, the engineering firm retained by the Township issued the first draft DMMP for the Bay, with funds provided by the DOT. The ODST states that, although the DEP had indicated that a proposed site on Marconi Road in Wall Township was environmentally sensitive, that site had been included in the draft DMMP as a preferred site. The ODST provided comments on the draft DMMP and stated, among other things, that the Township would have to undertake an in-depth analysis of alternative sites before a permit could be issued for the Marconi Road site.
The ODST also states that in August 2007, it prepared a sediment sampling plan but sampling did not occur because an acceptable dewatering site had not been identified. In December 2008, March 2009, and June 2009, representatives from the ODST met with Wall Township's representatives to discuss various sites within that municipality.
The ODST prepared another sediment sampling plan in August 2009. In September 2009, the ODST attended a joint site visit to a property in Neptune Township to evaluate its potential as a dredged material management site. The ODST concluded that sites with less environmental impact were available.
The ODST asserts that since the Township filed its complaint in October 2009, it has continued to take steps to identify an appropriate dredged material site. It believes a site in Wall Township might be acceptable. Also, in February 2011, the DEP's Bureau of Coastal Engineering in the Office of Engineering and Construction (BCE) had an analysis made to determine whether any of the dredged material might be suitable for beach replenishment. The analysis concluded that it was not. The ODST states that, as yet, an acceptable dredged material management site had not been identified.
In addition, Dave Rosenblatt (Rosenblatt), Administrator of the BCE, issued a report dated September 2, 2011, stating that the DEP is authorized by N.J.S.A. 12:6B-5 to conduct dredging operations in the State's waters. Rosenblatt notes that the DOT's Office of Marine Resources (OMR) is required by N.J.S.A. 12:6B-4 to establish a priority list for dredging and dredged material projects on an as-needed basis. Rosenblatt states that the priority list is created
to maintain the viability of navigation channels in order to promote commerce, recreation and tourism, and to create and maintain jobs in New Jersey. In developing a project priority list, the OMR is required to develop and implement a dredging and dredged material management and disposal plan in consultation with the DEP under N.J.S.A. 12:6B-5.
Rosenblatt also says that during the previous five years, the DEP and DOT have received more than one hundred requests to place dredging projects on the priority list. The Shark River Bay project is one of four dredging projects that remain on the priority list as a "carry-over[]" from prior years. Rosenblatt stated, "The Legislature may require the DEP to undertake specific dredging projects. However, the Legislature has neither required that the DEP undertake the proposed dredging project at Shark River *798 Bay nor provided a direct appropriation for the project."
Rosenblatt additionally says that the dredging requires the issuance of permits by the ODST and the ACOE. Funding must be available and a temporary and permanent disposal site must be identified for a dredging project before permits are issued. He states, "The availability of funding and identification of acceptable disposal areas are the primary determinants as to whether projects proceed." Rosenblatt notes that the BCE awards contracts for dredging with funds appropriated by the Legislature.

III.
The Township argues that the court should remand the matter to the Law Division or an appropriate public agency for discovery and the creation of a record for review. We disagree.
Rule 2:2-3(a)(2) provides that appeals may be taken to the Appellate Division as of right from final decisions or actions of state administrative agencies. The Appellate Division's jurisdiction under the rule extends to State agency action and inaction. N.J. Civil Serv. Ass'n v. State, 88 N.J. 605, 612, 443 A.2d 1070 (1982); Hosp. Center at Orange v. Guhl, 331 N.J.Super. 322, 329-30, 751 A.2d 1077 (App.Div.2000). With the exception of matters involving condemnation or inverse condemnation, which should be heard in the Law Division,
the appropriate procedural route for a party claiming to be adversely affected by the inaction of a state administrative agency is to file a notice of appeal and motion for summary disposition accompanied by a supporting brief, certification and other relevant factual materials. The agency's response to such a motion affords th[e Appellate Division] an opportunity to determine whether there is any dispute concerning the factual allegations upon which an inaction claim is grounded. If there is no dispute, th[e Appellate Division] can proceed to a prompt disposition of the claim. If there is a dispute, the matter can be remanded to the agency, an Administrative Law Judge or the Law Division to develop a record and make appropriate factual findings.
[Id. at 330, 751 A.2d 1077.]
Here, the Township seeks review of the DEP's inaction, specifically, its failure to dredge the State navigational channels in the Bay, and its failure to select a site for the dewatering of dredged materials. Such claims are within this court's exclusive jurisdiction under Rule 2:2-3(a)(2). Furthermore, a remand for discovery and development of a factual record is not warranted because the facts material to our decision are essentially undisputed.
The Township argues that Frapaul Construction Company v. State of New Jersey, Department of Transportation, 175 N.J.Super. 84, 89-92, 417 A.2d 592 (App. Div.1980), requires that we remand the matter to the Law Division for a hearing. We do not agree. Frapaul involved a claim for payment allegedly due under a contract between the plaintiff and the DOT. Id. at 87, 417 A.2d 592. The DOT's Claims Committee (Committee) had considered and rejected the claim. Ibid.
We held that determinations of the Committee were not final decisions within the contemplation of Rule 2:2-3(a)(2). Id. at 91, 417 A.2d 592. We noted that the Committee did not make its decisions after the parties had an opportunity for discovery or a judicial-type hearing. Ibid. We also noted that there were no transcripts of the Committee's meetings and, therefore, no record upon which we could review its decisions. Ibid.
*799 Frapaul does not apply here. This case does not involve a decision by the Committee on a contract-based claim. Furthermore, this matter involves agency inaction, not agency action. This court has exclusive jurisdiction in such cases, as indicated in Hosp. Center at Orange. Moreover, as we have explained, Hosp. Center at Orange spells out the procedure that should be followed in order to create a record for review by this court when there are disputed material issues of fact.

IV.
Next, the Township argues that we should issue a judgment declaring that the DEP is required to dredge the State navigational channels within the Bay by a date certain and find a suitable site for the dewatering of the dredged materials. Again, we disagree.
The Township characterizes this matter as a declaratory judgment action, but it is seeking more than a declaration of the legal rights and relations of the parties. The Township is seeking an order compelling the DEP to take certain actions, specifically the dredging of the Bay and the designation of a site for the temporary placement of the dredged materials. Thus, this is not a declaratory judgment action but rather one seeking relief in the form of mandamus.
Such relief is only appropriate where the party seeks to compel a governmental agency to perform a "duty [that] is ministerial and wholly free from doubt" or "to compel the exercise of discretion, but not in a specific manner." Loigman v. Twp. Comm. of Middletown, 297 N.J.Super. 287, 299, 687 A.2d 1091 (App.Div. 1997). In Switz v. Township of Middletown, 23 N.J. 580, 130 A.2d 15 (1957), the Court explained that:
[t]he generally accepted limitations upon the exercise of the ancient extraordinary writ of mandamus obtain in New Jersey. It is a coercive process that commands the performance of a specific ministerial act or duty, or compels the exercise of a discretionary function, but does not seek to interfere with or control the mode and manner of its exercise or to influence or direct a particular result. Mandamus lies to compel but not control the exercise of discretion. Unless the particular duty be peremptory, the fair use of judgment and discretion is the province of the functioning authority. The right of the relator and the public duty sought to be enforced must be both clear and certain. Mandamus issues "to compel the performance, in a specified manner, of ministerial duties so plain in point of law and so clear in matter of fact that no element of discretion is left to the precise mode of their performance, but as to all acts or duties depending upon a jurisdiction to decide questions of law or to ascertain matters of fact, on the part of the officer or body at whose hands their performance is required, mandamus will not lie."
[Id. at 587-88, 130 A.2d 15 (internal citations omitted).]
The DEP does not have a statutory duty to dredge the navigational channels in the Bay nor is it required to do so by a date certain. The OMR in the DOT has statutory authority to establish, upon consultation with the DEP, a project priority list
for dredging, dredged material disposal projects and decontamination projects based primarily on the maintenance of the viability of the Port of New Jersey and New York as a deep water port accessible to international commerce, on the maintenance of the viability of navigation *800 channels not located in the port region to promote commerce, recreation and tourism, and on the prospects for the creation and retention of jobs in New Jersey.
[N.J.S.A. 12:6B-4(a).]
The priority list is forwarded to a task force established by N.J.S.A. 12:6B-3 for its approval. N.J.S.A. 12:6B-4(a). The approved list is then forwarded to the Senate President and Speaker of the General Assembly, "who shall cause the project priority list to be introduced in each House in the form of legislative appropriation bills." N.J.S.A. 12:6B-4(b). The Legislature then considers whether to appropriate funds for the projects. N.J.S.A. 12:6B-4(c).
In addition, the OMR, in consultation with the DEP and the aforementioned task force, is required to develop, implement and maintain a comprehensive dredging and dredged material management and disposal plan, including dredged material decontamination, for the State's navigable waters. N.J.S.A. 12:6B-5(a). Among other things, the DEP and the DOT are authorized to enter into agreements for "the development, operation and management of dredging projects...." N.J.S.A. 12:6B-5(b)(1).
These statutes give the DOT and the DEP broad discretion in determining whether a particular dredging project should be placed on the priority list. As we stated previously, it appears that the Bay's dredging project was placed on the priority list. However, there is no evidence indicating that the project has satisfied all State and federal permitting requirements, which must be met before a project is deemed eligible for funding. Under these circumstances, the court cannot order the DEP to dredge the State's navigational channel in the Bay or to do so by a date certain.
The Township argues that N.J.S.A. 12:6-8 requires the DEP to dredge the State navigational channels in the Bay. The statute provides that the DEP "may improve, by deepening and widening as it shall deem advisable, such streams, creeks, rivers or inlets as connect with or are tributaries to the inland waterway system or that connect with or flow through any of the tidal waters bordering or adjacent to the Atlantic ocean." Ibid. The statute confers discretion upon the DEP to determine whether any "deepening" or "widening" is advisable. It does not compel the DEP to undertake any specific "deepening" or "widening" project.
The Township further argues that N.J.S.A. 12:6-13 requires the DEP to dredge the channels. This statute provides, among other things, conditions for the issuance of permits to dredge the Shark River, west of a certain railroad line. Ibid. The statute does not require the DEP to dredge the Shark River. It merely specifies the conditions that the DEP must impose if dredging is approved.
The Township additionally argues that the DEP must dredge the channels because funds are allegedly available for this purpose under the Port of New Jersey Revitalization, Dredging, Environmental Cleanup, Lake Restoration and Delaware Bay Area Economic Development Bond Act of 1996. L. 1996, c. 70. The Act authorizes the State to issue up to $20,000,000 in general obligation bonds to finance dredging of navigation channels located outside of the port region. L. 1996, c. 70, § 7.
But assuming such bonds were issued and the bond proceeds have been deposited into the Dredging and Containment Fund created under the Act, those funds could not be spent unless appropriated by *801 the Legislature. L. 1996, c. 70, § 18. Even if the Legislature had appropriated the funds, this would not preclude the DEP from exercising its discretion in determining the manner in which the project should be implemented.
The Township's demand for an order compelling the DEP to provide a site for the dredged materials stands on no stronger foundation. This is also a request to compel the DEP to take specific discretionary action. Moreover, there is no basis for the Township's claim that the DEP has improperly failed to act on the selection of the site.
The record shows that the DEP has been working with the Township and other affected municipalities to identify an appropriate site for the placement of the dredged materials. As the DEP explains, the site selection has been delayed due to environmental concerns. The DEP says that it will continue to work with the Township to find an appropriate site. We have no reason to believe it will not do so. We are therefore satisfied that the court may not compel the DEP to take any discretionary action with regard to the selection of the site at this time.

V.
The Township raises several additional arguments in support of its demand for an order compelling the DEP to dredge the channels and provide a site for the dredged materials. We consider each argument in turn.
The Township contends that DEP's failure to act represents the breach of an implied contract. We do not agree. An implied contract "consists of an obligation `arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words[.]'" Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9, 29, 138 A.2d 402 (1958) (quoting Williston on Contracts, § 3 3d ed. 1957). Furthermore, as the Court stated in Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 144 N.J. 564, 574, 677 A.2d 747 (1996):
[C]ontracts implied in fact are no different than express contracts, although they exhibit a different way or form of expressing assent than through statements and writings. Courts often find and enforce implied promises by interpretation of a promisor's word or conduct in light of the surrounding circumstances.
Here, there is no evidence that the DEP ever agreed, through its statements or writings, to dredge the channels or identify a site for the dredged materials. The DEP has made clear that any such project requires consideration of a variety of environmental issues, issuance of permits and identification of a funding source. Thus, there is no implied contract on the part of DEP to dredge the channels or pick a site for the dredged materials.
The Township also argues that the DEP should be equitably estopped from refusing to dredge the channels and pick a site for the materials. Again, we disagree. Equitable estoppel requires a showing of a (1) knowing and intentional misrepresentation by the party sought to be estopped; (2) under circumstances in which the misrepresentation would probably induce reliance; and (3) reliance by the party seeking estoppel to his or her detriment. O'Malley v. Dept. of Energy, 109 N.J. 309, 317, 537 A.2d 647 (1987).
The Township's equitable estoppel claim is based on the following facts. The DEP provided some of the monies needed by the Township to purchase the marina property. In addition, the DOT provided some funds for the creation of the DMMP. *802 The State has also provided monies to allow the Township to create a "Shark River Bay Regional Visioning Plan" and a "Shark River Municipal Marina Strategic Plan." These actions do not, however, amount to an intentional and knowing misrepresentation by the DEP that it would dredge the channels or identify a site for the dredged materials. Moreover, these actions are insufficient to induce reliance by the Township based upon an expectation that the DEP would dredge the channels by a date certain.
The Township further contends that the DEP's failure to dredge the channels violates the public trust doctrine. That doctrine "derives from the ancient principle of English law that land covered by tidal waters belonged to the sovereign, but for the common use of all the people." Borough of Neptune City v. Borough of Avon-By-The-Sea, 61 N.J. 296, 303, 294 A.2d 47 (1972). The doctrine has been applied to ensure public access to beach areas. Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 532, 874 A.2d 1064 (2005). In evaluating claims brought under the doctrine, the Court has stated that "[t]he public interest is satisfied so long as there is reasonable access to the sea." Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 324, 471 A.2d 355 (1984).
The Township has cited no authority for the proposition that the public trust doctrine requires the State to dredge the channels. As we have explained, the Legislature has delegated to the DEP and the DOT broad discretion to determine when and how to undertake such projects. The public trust doctrine therefore does not provide a legal basis for the court to compel the DEP to dredge the channels.
The Township additionally contends that the DEP's failure to dredge the channels represents a public nuisance which requires the court's intervention. The courts will not declare an activity to be a public nuisance, when the activity is subject to a comprehensive legislative and regulatory scheme. In re Lead Paint Litig., 191 N.J. 405, 424, 924 A.2d 484 (2007) (citing Restatement (Second) of Torts, § 821B, comment. C (1979)). The dredging of the State's navigational channels is governed by statutes and an assortment of administrative regulations. Therefore, the DEP's failure to dredge the Bay's channels cannot be declared a public nuisance.
The Township's complaint is dismissed with prejudice.