**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3514-23

BRAINBUILDERS, LLC,

    Plaintiff-Appellant,

v.

OSCAR GARDEN STATE
INSURANCE CORPORATION,

    Defendant-Respondent.

_____

Argued November 12, 2025 – Decided December 11, 2025

Before Judges Susswein, Chase and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-1714-19.

Peter M. Slocum argued the cause for appellant (Lowenstein Sandler, LLP, and Sarmasti PLLC, attorneys; Peter M. Slocum, Anish Patel and Vafa Sarmasti, of counsel and on the briefs).

David Jay argued the cause for respondent (Greenberg Traurig, LLP, attorneys; David Jay, Todd L. Schleifstein and Samantha L. Varsalona, on the brief).

PER CURIAM

This appeal concerns a dispute between a service provider and a health insurance carrier. Plaintiff BrainBuilders, LLC (BrainBuilders) provided behavioral health services to eight children with autism. Defendant Oscar Garden State Insurance Corporation (Oscar) provided health insurance coverage for the children but did not include BrainBuilders as an in-network provider. The children's insurance plans do not reimburse out-of-network providers unless there is a case-specific approval for services, known as a Single Case Agreement (SCA).

BrainBuilders appeals from a May 6, 2024 Law Division order granting summary judgment in Oscar's favor, dismissing plaintiff's claims of breach of implied contract, promissory estoppel, unjust enrichment, and quantum meruit. BrainBuilders also appeals from the trial court's order denying its motion for reconsideration. After reviewing the record in light of the governing legal principles, we affirm.

I.

We discern the following pertinent facts and procedural history from the record. BrainBuilders provided services, including applied behavioral analysis (ABA), to eight minor patients: R.G., L.K., Y.F., E.G., S.S., Y.S., S.T., and

Y.T.[1]  All except Y.F. were already in BrainBuilders' care when they became insured by Oscar.  Under the Oscar health insurance plans, seven patients had no coverage at all for services by out-of-network providers.  The eighth patient, Y.T., had a plan that included fifty percent co-insurance for out-of-network behavioral health services.  Oscar denied reimbursement to BrainBuilders for services provided to the eight patients without an SCA.

BrainBuilders' Director of Finances, Simon Nussbaum, testified that the "most common situation" in which the parties would execute an SCA was to maintain "continuation of care" despite a change in a child's insurance coverage.  According to Oscar and its administrator, Optum, the purpose of these agreements was to permit necessary care while giving a patient time to "transition to in-network providers."

The parties entered at least one SCA for each of the eight patients' care.  Each SCA was limited to specific treatments for a specific patient.

A representative SCA stated in pertinent part:  "It is understood that this SCA is ONLY for the Member listed above and the Service(s) listed above.  It is not a general participation agreement and Provider is not considered an in-

---

[1]  We use initials to protect the confidentiality of the children's medical records.  See R. 1:38-3(a)(2).

network provider with Oscar."  It further stated:  "To the extent that additional services beyond those set forth above are needed, additional authorization <u>must</u> be sought by Provider prior to the services being provided or Provider will be responsible for the full cost of the additional services."  It also provided that certain "medically necessary service(s) beyond those set forth" in the SCA would "be reimbursed at the discretion of Oscar at no more than the lesser of billed charges, Oscar's prevailing reimbursement rate, or 100% of the Medicare Fee Schedule."

BrainBuilders or its patients sought SCAs for ABA therapy.  Optum responded to many applications for SCAs for ABA therapy with a denial letter including the names of in-network providers.

Nussbaum was not satisfied with the case-by-case SCA process and attempted to negotiate an overall agreement in which Oscar would reimburse claims for BrainBuilders' ABA services.  Initially, Nussbaum offered Oscar an "overall" rate agreement that would cover any out-of-network behavioral health services BrainBuilders provided to Oscar's insureds.  Nussbaum later proposed a different rate agreement to Optum, based on an agreement he had reached with another health insurer.  Optum responded that it was reviewing the offer and

4

"working with Oscar to seek their approval since it is their money that [was] paying for all of this."

Nussbaum reprised his offer to Oscar to establish an "umbrella" agreement "for all services that Brain[B]uilders provides to children with autism." Oscar representative Yael Kino responded:

> I've forwarded your message to the relevant stakeholders for review. In the meantime, can you confirm whether or not you have been able to finalize the contracts with Optum for the ABA therapy?
>
> We want to make sure [BrainBuilders] is getting reimbursed for services that are currently taking place.

Nussbaum replied:

> Optum has yet to work out the final details in regard to the SCA for ABA therapy and they are giving us a very hard time. Furthermore in regard to one [patient, L.K.,] they left us a message they will be terminating the agreement going forward as per the plan (even though there is really no one the child can transition to).

In further emails to Kino, Nussbaum continued to request a rate agreement for services rendered to Oscar's insureds and reiterated that BrainBuilders had not reached an agreement with Optum. He complained about E.G. in particular, who he believed—like L.K.—had "nowhere to transfer . . . to [without being] damaged by the transfer, and maybe nowhere at all to transfer her to."

A-3514-23

BrainBuilders continued to press Oscar to accept its proposal, but according to Nussbaum, the parties "never came to a one size fits all rate agreement." Nussbaum testified his negotiations with Kino came to "a harsh end." Similarly, he testified his negotiations with Optum "slipped by the wayside" as no "actual rates agreement" was ever reached. In the meantime, BrainBuilders continued to provide ABA services to the eight patients even after the parties' negotiations stalled.

BrainBuilders billed Oscar a total of $8,265,820 for services rendered to the eight patients. Oscar paid $842,964 in reimbursements in accordance with the SCAs. Nussbaum complained to Oscar about the reimbursements. He told Oscar he believed it had "approved the authorization" for all these patients' ABA services, but that Optum failed "to finalize the rates." Oscar replied that the SCAs provided that "if any additional services not outlined in the SCA need to be rendered, the provider will obtain prior authorization prior to rendering those services." Oscar reiterated that "BrainBuilders is out of network with Oscar," and further explained:

> As for the amount paid on the claims that did not deny
> [sic], it looks like they have processed in accordance
> with each SCA. The claims would not pay at an in
> network rate, because you are not currently
> participating in the Oscar network. They would also

6

not pay at 100% of the billed charges because a different amount to be paid was agreed on in each SCA.

BrainBuilders continued to provide ABA services to the eight patients and on June 18, 2019, filed the present civil complaint, alleging liability based on breach of implied contract, promissory estoppel, unjust enrichment, and quantum meruit. On October 6, 2023, Oscar filed a notice of motion for summary judgment on all causes of action.

On May 6, 2024, the trial court granted summary judgment in Oscar's favor. On the implied contract claim, the court found the evidence demonstrated "there was neither any agreement nor any promise by Oscar to pay BrainBuilders for the ABA services provided to Oscar's members." The court granted summary judgment on the promissory estoppel claim because BrainBuilders failed to proffer facts indicating that Oscar made any "promises for payment." The court granted summary judgment on the quantum meruit and unjust enrichment claims because BrainBuilders provided no unjust benefit to Oscar, and its expectation of payment was unreasonable.

On May 28, 2024, BrainBuilders moved for reconsideration. On June 20, 2024, the court heard argument and denied the motion. This appeal follows.

BrainBuilders raises the following contentions for our consideration:

A-3514-23

POINT I
THE TRIAL COURT ERRED IN GRANTING
SUMMARY JUDGMENT ON BRAINBUILDERS'
IMPLIED CONTRACT CLAIM.

  A. The Facts in the Record Are Sufficient to
    Show that an Implied Contract Exists
    Between Oscar and BrainBuilders.

POINT II
THE TRIAL COURT ERRED IN GRANTING
SUMMARY JUDGMENT ON BRAINBUILDERS'
PROMISSORY ESTOPPEL CLAIM.

  A. Oscar's Promises of Compensation Are
    Sufficient for BrainBuilders' Promissory
    Estoppel Claim.

  B. BrainBuilders Reasonably Relied on Oscar's
    Promises to Its Detriment.

POINT III
THE TRIAL COURT ERRED IN GRANTING
SUMMARY JUDGMENT ON BRAINBUILDERS'
UNJUST ENRICHMENT AND QUANTUM MERUIT
CLAIMS.

II.

We begin our analysis by acknowledging the general legal principles governing this appeal, including the standard of our review. We review decisions on a motion for summary judgment de novo, applying "the same standard as the trial court." Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021). Further, no deference is owed to the trial court's legal analysis. RSI Bank v.

Providence Mut. Fire. Ins. Co., 234 N.J. 459, 472 (2018) (citing Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016)).

Courts must grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Friedman v. Martinez, 242 N.J. 449, 471-72 (2020) (quoting R. 4:46-2(c)). Furthermore, a court should grant summary judgment when "the evidence 'is so one-sided that [the moving] party must prevail as a matter of law.'" Rios, 247 N.J. at 13 (quoting Petro-Lubricant Testing Labs, Inc. v. Adelman, 233 N.J. 236, 257 (2018)).

In contrast, the court must deny summary judgment if the evidence is conflicting and there are material facts in dispute that a rational factfinder could resolve in favor of the non-movant. Mangual v. Berezinsky, 428 N.J. Super. 299, 308-09 (App. Div. 2012); accord Conforti v. Cnty. of Ocean, 255 N.J. 142, 162 (2023) (quoting Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 125 (2023)) (courts "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient

9

to permit a rational factfinder to resolve the alleged disputed issue in favor of the" non-movant).

In applying this standard, the "court must accept as true all the evidence which supports the position of the party defending against the motion and must accord [them] the benefit of all legitimate inferences which can be deduced therefrom." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995) (quoting Lanzet v. Greenberg, 126 N.J. 168, 174 (1991) and S. Pressler, Current N.J. Court Rules, R. 4:40-2 comment (1991)); see also Crisitello v. St. Theresa Sch., 255 N.J. 200, 218 (2023) (allowing "reasonable inferences" from the record in the non-movant's favor).

However, "conclusory and self-serving assertions by one of the parties are insufficient" to overcome a summary judgment motion. Dickson v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 533 (App. Div. 2019) (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005)). Stated another way, the non-movant cannot point "'to any fact in dispute' in order to defeat summary judgment." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (quoting and emphasizing Brill, 142 N.J. at 529). Thus, if the non-movant

> offers . . . only facts which are immaterial or of an insubstantial nature, a mere scintilla, "fanciful, frivolous, gauzy or merely suspicious," he will not be heard to complain if the court grants summary

10

> judgment, taking as true the statement of uncontradicted facts in the papers relied upon by the moving party, such papers themselves not otherwise showing the existence of an issue of material fact.
>
> [Id. at 480 (quoting Brill, 142 N.J. at 529).]

## III.

We first address BrainBuilders' contention that the trial court erred in holding that Oscar did not breach an implied contract to compensate BrainBuilders for the services it rendered to the eight patients. BrainBuilders offers several arguments for the conclusion that it had an implied contract with Oscar. First, BrainBuilders contends Oscar was obliged, pursuant to the "Healthcare Quality Act and Autism Mandate," to offer its insureds a proper in-network ABA provider. According to BrainBuilders, because no available provider could meet the Act's criteria, Oscar was required to accept claims from BrainBuilders, which "was already providing services to meet the unique needs" of the eight patients. BrainBuilders contends this circumstance provided consideration for an implied contract.

BrainBuilders further contends that "Oscar, in part, performed" its alleged implied contractual obligation. Specifically, BrainBuilders highlights that Optum, acting on Oscar's behalf, reimbursed some claims, including some made after this litigation began. By paying those claims, BrainBuilders contends,

11

Oscar and Optum followed their normal practice of ensuring continuity-of-care treatment of their insureds when no suitable in-network provider was available.

Finally, BrainBuilders argues that as "a matter of common sense, BrainBuilders would have had no reason to treat" Oscar's insureds "without the promise of payment for its services."

A.

Beginning with the relevant contract law principles, implied contract claims are fact sensitive and generally unsuitable to a summary judgment resolution. Troy v. Rutgers, 168 N.J. 354, 366 (2001). However, if "no reasonable juror" could conclude such a contract existed, courts may resolve the issue on motion. Ibid.

Implied contracts differ from express contracts in that they "exhibit a different way or form of expressing assent." Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 70 (2024) (quoting Wanaque Borough Sewage Auth. v. Twp. of West Milford, 144 N.J. 564, 574 (1996)). "Implied-in-fact contracts are formed by conditions manifested by words and inferred from circumstances . . . ." Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 109 (2007). To assess whether an implied contract exists, courts look to "the parties' actions, course of conduct, oral expressions, or a combination of the three."

A-3514-23

Comprehensive Neurosurgical, P.C., 257 N.J. at 71; see also Saint Barnabas Med. Ctr. v. Essex Cnty., 111 N.J. 67, 77 (1988) (courts consider the "objective proofs" as viewed by a "reasonable person engaged in [the] relevant custom or trade"). The doctrine reflects a "modern view" that, "'as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances.'" Troy, 168 N.J. at 366 (quoting Restatement (Second) of Conts. § 4 cmt. a (A.L.I. 1981)).

Where an express contract already exists, moreover, additional "terms may be implied . . . not because they are reasonable, but because they are necessarily involved in the contractual relationship so that the parties must have intended them." Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130 (1965). "Where fairness and justice require, even though the parties to a contract have not expressed an intention in specific language, the courts may impose a constructive condition to accomplish such a result when it is apparent that it is" a necessary incident to the existing agreement. Ibid.

In other respects, implied contracts "are no different than express" ones. Comprehensive Neurosurgical, P.C., 257 N.J. at 70 (quoting Wanaque Borough Sewage Auth., 144 N.J. at 574). An obligation enforceable at law results where

parties agree to the "basic features" of "offer, acceptance, consideration, and performance." Goldfarb v. Solimine, 245 N.J. 326, 339 (2021) (quoting Shelton v. Restaurant.com, Inc., 214 N.J. 419, 439 (2013)).

In particular, there can be no contract without "a manifestation of mutual assent by the parties to the same terms." Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 538 (1953). "Mutual assent requires that the parties have an understanding of the terms to which they have agreed." Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 442 (2014). This assent must manifest in an "unqualified acceptance." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (quoting Johnson & Johnson, 11 N.J. at 539). In the context of implied contracts especially, it "is elementary that there can be no operative acceptance by acts or conduct unless the offeree's assent to the offer according to its terms is thereby unequivocally shown." Johnson & Johnson, 11 N.J. at 538; see, e.g., Twp. of Neptune v. State, Dep't of Env't Prot., 425 N.J. Super. 422, 437-38 (App. Div. 2012) (finding no implied contract where there was "no evidence" that one party "ever agreed, through its statements or writings," to enter the contract alleged by the other party, and in fact had "made clear that any such project requires consideration of a variety of environmental issues, issuance of permits and identification of a funding source").

14

Additionally, an implied contract's terms must "be sufficiently clear and capable of judicial interpretation." Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 290 (1988). An implied contract requires "sufficient definiteness of terms so that the performance required of each party can be ascertained with reasonable certainty, as well as knowledge of and acquiescence in the stated terms." Cooper River Plaza E., LLC v. Briad Grp., 359 N.J. Super. 518, 527 (App. Div. 2003) (citing Ryan, 128 N.J. at 435).

B.

Although we review summary judgment appeals de novo, we deem it helpful to summarize the findings of fact and conclusions of law made by the trial court in analyzing BrainBuilders' implied contract claim. In reaching its conclusions, the trial court was mindful that the existence of an implied contract is a factual issue that generally precludes summary judgment. Nevertheless, the court dismissed BrainBuilders' claim, reasoning that the evidence demonstrates there was neither any agreement nor any promise by Oscar to pay BrainBuilders for the ABA services provided to Oscar's members.

The trial court found that, to begin with, the "relationship between an insurer and a health service provider is not direct," creating "no defined parameters of an express contract." "Significantly in this case," the court added,

15

BrainBuilders knew the parties originally had no contractual relationship at all. It had never received any payment in any amount from Oscar for any services provided to its patients, and Oscar's plans generally had no out-of-network coverage for autism-related services, although Oscar granted "exceptions" to that rule "on a case-by-case basis."

The court noted that it was only when BrainBuilders and Oscar entered into the SCAs for eight patients that they "did . . . have an agreement." The court found that, under the SCAs, "Oscar's obligation to compensate the provider is limited to the time period set forth in the agreement and those services recognized for payment as specifically identified in the agreement." The SCAs, the trial court reasoned, disclaimed any "general participation agreement," approval of services beyond those described in the SCA, or inclusion of BrainBuilders in Oscar's network.

Relatedly, the trial court found "no evidence to suggest that any agreement for Oscar to pay for medical services was entered into by the parties that was beyond the language of" the SCAs. The court further found that "[n]o promises were made to BrainBuilders, nor were any inducements provided for BrainBuilders to continue treating out-of-network patients beyond the written communications exchanged between the parties." The court thus concluded that

16

BrainBuilders failed to establish an implied contract claim to compensation for services "outside the scope of the" SCAs.

The trial court also addressed BrainBuilders' contention that when it continued treating patients outside the scope of the SCAs, it "reasonably expected Oscar to compensate" it at the "rate established in" the existing SCAs, pursuant to an implied contract. In rejecting that contention, the trial court found that Nussbaum had repeatedly offered "an 'overall' rate agreement," "three different potential rate 'options' for the ABA services," and "rates from an old agreement that BrainBuilders had reached with a different" insurer—none of which Oscar or Optum accepted. The trial court acknowledged that Oscar and Optum internally discussed whether they were obligated to reimburse BrainBuilders for services provided. But although Oscar inquired at least once into whether Nussbaum had in fact reached a new agreement with Optum, the court found no evidence in the record demonstrating any actual agreement or promise by Oscar to pay BrainBuilders for the ABA services provided to Oscar's members.

The court added that any prior clinical authorizations Optum provided for the eight patients' care "do not rise to the level of an implied contract. Mr.

Nussbaum has conceded that such documents do not reflect the intentions of the parties concerning reimbursement commitments."

Applying de novo review, we agree with the trial court's reasoning. To establish an implied contract, BrainBuilders needed to show unqualified acceptance by Oscar of an agreement other than the SCAs. We are satisfied that the undisputed evidence shows the parties entered into express contracts specifically instructing BrainBuilders not to exceed their scope, and Nussbaum testified that no other agreement or relationship ever came to fruition.

Because it is undisputed that neither Oscar nor Optum ever agreed to enter into a new general agreement, we hold there cannot be an implied contract that excused the parties from abiding by the terms of the SCAs, which made plain that reimbursement for services in addition to those specifically described in the SCAs would require additional SCAs, or else be subject to reimbursement at Oscar's discretion. See Quinn v. Quinn, 225 N.J. 34, 45 (2016) (parties "cannot expect a court to present to them a contract better than or different from the agreement they struck between themselves," and when the intent "is plain and the language is clear and unambiguous, a court must enforce the agreement").

We add that although the summary judgment standard requires a reviewing court to draw all reasonable inferences from the undisputed facts in

favor of the non-movant, <u>Crisitello</u>, 255 N.J. at 218, the law does not require the court to overlook unfavorable evidence. Here, the evidence showed the parties were unable to reach agreements beyond the SCAs, and the SCAs instructed BrainBuilders not to exceed their scope without further agreements. In these circumstances, we conclude no reasonable jury could find a new implied contract. <u>See</u> <u>Troy</u>, 168 N.J. at 366.

IV.

We next address BrainBuilders' contention the trial court erred by granting summary judgment dismissal on its claim for promissory estoppel. BrainBuilders contends that "Oscar made 'a clear and definite promise' to pay BrainBuilders for the ABA services rendered to the" eight patients by executing the SCAs, directing BrainBuilders "to negotiate rates with Optum," and reimbursing at least some "claims for out-of-network treatment provided to the" patients "even without SCAs." BrainBuilders further contends that if the parties "did not enter into an implied contract, it is clear that they were negotiating one." Finally, BrainBuilders contends it reasonably and detrimentally relied on Oscar's promises "based on Optum's continued issuance of written SCAs and Oscar's continued intermittent payment of BrainBuilders' bills."

19

When a party, "with expectation of remuneration, confers benefits of service or property upon another, under such circumstances that it would be unjust and inequitable for the person receiving the benefits to retain them without compensation therefor, the law" may provide "recovery for the value of such benefits conferred." Rabinowitz v. Massachusetts Bonding & Ins. Co., 119 N.J.L. 552, 556 (E. & A. 1938). Applying that general principle, we are unpersuaded by BrainBuilders' promissory estoppel argument. As the trial court aptly noted, BrainBuilders "cannot demonstrate the existence of any writing or conduct that rises to the level of a 'clear and definite promise' to make payments for reimbursement." Indeed, it was the lack of a promise for reimbursement that motivated BrainBuilders to continue the process of negotiation, which ultimately failed to produce a new contract.

We acknowledge that as a general matter, promissory estoppel claims are "essentially factual and inappropriate to a summary judgment" resolution. Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416, 423 (App. Div. 1971). Nevertheless, a court may resolve a promissory estoppel claim on motion if the undisputed facts do not show a possibility the plaintiff can prevail. Ibid.

To establish promissory estoppel, a plaintiff must show: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." Toll Bros., Inc. v. Bd. of Chosen Freeholders of Cnty. of Burlington, 194 N.J. 223, 253 (2008); accord Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J. Super. 463, 479 (App. Div. 1978).

"The essential justification for the promissory estoppel doctrine is to avoid the substantial hardship or injustice which would result if a clear and definite promise were not enforced." Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc., 307 N.J. Super. 461, 469 (App. Div. 1998). Accordingly, a clear and definite promise is the "sine qua non for applicability of this theory of recovery." Malaker Corp. Stockholders Protective Comm., 163 N.J. Super. at 479.

Here, unlike the situation in Pop's Cones—a case on which BrainBuilders heavily relies—Oscar made no explicit promise to establish the relationship BrainBuilders sought. Nor did Oscar instruct BrainBuilders to take any action consistent with such a relationship. In fact, Oscar made abundantly clear that it did not promise to continue reimbursing BrainBuilders for its services other than by means of SCAs. The SCAs, moreover, include express disclaimers that make clear that they do not constitute a general participation agreement and that the

21

only services that are approved are those that are specifically described in each individual SCA. The fact that BrainBuilders hoped through negotiation to transform its relationship with Oscar does not satisfy the requirement of a clear and definite promise that undergirds the promissory estoppel doctrine.

V.

Finally, we turn to BrainBuilders' contention that the trial court erred by granting summary judgment on its claims for unjust enrichment and quantum meruit. BrainBuilders argues that Oscar had a legal obligation to provide coverage for ABA therapy, and because BrainBuilders' services satisfied those obligations, it would be unjust if Oscar were not required to compensate BrainBuilders for those services.

In support of that contention, BrainBuilders claims that the New Jersey Autism Mandate, N.J.S.A. 17B:27a-7.16; the New Jersey Healthcare Quality Act, N.J.S.A. 26:2S-1 to -40; and the Healthcare Quality Act's implementing regulations, N.J.A.C. 11:24A-1.1 to -5.3; all required Oscar to cover the ABA services BrainBuilders rendered to the eight patients. This argument in turn hinges on BrainBuilders' assertion that the eight patients were members of an Orthodox Jewish community and thus had unique cultural needs inadequately

22

served by the providers in Oscar's existing network.  See N.J.A.C. 11:24A-4.10(a) (requiring insurers "to maintain an 'adequate network' of providers").

Oscar does not dispute that it has a legal obligation to cover ABA therapy for insured children but contends that BrainBuilders essentially waived its arguments under the governing insurance statutes and implementing regulations because these arguments were not advanced in the trial court.  In the alternative, Oscar maintains that BrainBuilders' unjust enrichment and quantum meruit claims fail because they are based on unsupported and "un-pleaded allegations that Oscar, through Optum, lacked an 'adequate' or 'suitable' network of behavioral health providers to comply with the regulations."  Oscar maintains it contracted with Optum to ensure its members had ready access to an adequate behavioral network that had been reviewed and approved by the New Jersey Department of Banking and Insurance.

"To prove a claim for unjust enrichment, a party must demonstrate that the opposing party 'received a benefit and that retention of that benefit without payment would be unjust.'"  Thieme v. Aucoin-Thieme, 227 N.J. 269, 288 (2016) (quoting Iliadis., 191 N.J. at 110).  The claimant must also show "it expected remuneration from the defendant at the time it performed or conferred a benefit

on [the] defendant and that the failure of remuneration enriched [the] defendant beyond its contractual rights." Ibid. (quoting Iliadis, 191 N.J. at 110).

Unjust enrichment is also needed to prove a claim for quantum meruit. F. Bender, Inc. v. Jos. L. Muscarelle, Inc., 304 N.J. Super. 282, 285 (App. Div. 1997). The quantum meruit cause of action "rests on the equitable principle that a person shall not be" enriched "unjustly at the expense of another." Starkey, Kelly, Blaney & White v. Est. of Nicolaysen, 172 N.J. 60, 68 (2002) (quoting Ryan, 128 N.J. at 437). To prevail under that theory, the plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Ibid. (quoting Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994)).

We conclude that the record lacks competent evidence supporting BrainBuilders' assertions regarding the adequacy of Oscar's network of behavioral health providers with respect to Orthodox Jewish children. BrainBuilders' assertion that no in-network provider could adequately treat Orthodox Jewish patients rests on conclusory, self-serving, and uncorroborated statements. Cf. Dickson, 458 N.J. Super. at 533 (quoting Puder, 183 N.J. at 440-41).

Because we conclude the trial court properly granted summary judgment in Oscar's favor, we also affirm the denial of BrainBuilders' motion for reconsideration.

To the extent we have not specifically addressed them, any remaining arguments raised by BrainBuilders lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-3514-23